Charles E. AUSTIN, et al., Plaintiffs,

v.

Reginald WILKINSON,
et al., Defendants.

No. 4:01–CV–0071.

United States District Court,
N.D. Ohio.

Aug. 7, 2006.

Alice Lynd, Staughton Lynd, Law Office of Staughton & Alice Lynd, Niles, OH, Bill Goodman, New York City, Jeffrey M. Gamso, ACLU of Ohio Foundation, Michael J. Benza, Terry H. Gilbert, Friedman & Gilbert, Cleveland, OH, Jules L. Lobel, Pittsburgh, PA, for Plaintiffs.

Jeffrey A. Stankunas, James Eric Holloway, Mark D. Landes, Isaac, Brant, Ledman & Teetor, Carol H. O'Brien, Charissa D. Payer, Joseph M. Mancini, Todd R. Marti, Office of the Attorney General, Columbus, OH, Marianne Pressman, Office of the Attorney General, Cincinnati, OH, Robert C. Angell, Robert C. Angell, LLC, Westerville, OH, for Defendants.

## ORDER AND OPINION

[Resolving Doc. Nos. 666, 669]

GWIN, District Judge.

Plaintiff Frederick Tate moves the Court for an order that requires the Defendants (collectively, "Ohio") to reduce his security placement from level 5 to level 4 [Doc. 666]. With this motion, Tate argues that he was improperly transferred from the Trumbull Correctional Institution ("TCI") to Ohio State Penitentiary ("OSP"), a super maximum security facility. Tate says that in transferring him, Ohio violated his right to Due Process of law. On May 11, 2006, Ohio filed a Memorandum in Opposition to Plaintiff's motion [Doc. 669].

For the following reasons, the Court GRANTS Plaintiff's Motion to Compel. The Court further ORDERS the State of Ohio to review Tate's security placement in a manner consistent with this Opinion.

### I. Background

On July 30, 2005, Frederick Tate was involved in a physical altercation with his cell-mate, Major Lee. (Mot. Compel Ex. 11–3.) Lee initiated the altercation by punching Tate several times in the face. In reaction, Tate grabbed Lee's throat,

which ultimately asphyxiated and killed him. (*Id.*) All physical evidence and both inmates' behavioral records support Tate's claims that Lee instigated the fight and that Tate acted largely in self-defense. (*Id.*)

In reviewing the altercation, TCI's Rules Infraction Board ("RIB") found that Tate caused Lee's death in violation of RIB Rule 1.[1] (Mot. Compel Ex. 13.) Additionally, the RIB found insufficient evidence showing that Tate acted solely in self-defense, faulting his failure to call for assistance from the guards. (*Id.*) Accordingly, on October 31, 2005, the Classification Committee (the "Committee") notified Tate that it would hold a hearing to determine whether his security placement[2] should increase to level 5. (*Id.* at 5–7.) Tate attended the hearing to defend himself. At the hearing, Tate stated that when he initially met Lee, Tate believed that Lee was "unstable" and "not about the right thing." (*Id.* at 9.) Tate also reiterated that he did not cause the altercation, that he did not intend to kill Lee, and that he regretted Lee's death. (*Id.*) He also noted that he was working towards obtaining his G.E.D. and hoped to find work as a carpenter after he received parole. (*Id.*)

On November 3, 2005, the Committee recommended that Tate's security placement remain at level 4. (*Id.* at 8–12.) The Committee determined that Tate did not initiate the altercation, that he acted in response to Lee's attack, and that he had not exhibited a pattern of dangerous or violent behavior during his time at TCI.

(*Id.*) Thus, the Committee found that Tate did not present a threat warranting a level 5 security placement. (*Id.* at 8–12.)

Despite this, the TCI Warden, also relying on the RIB findings, subsequently recommended a level 5 security placement for Tate. (Mot. Compel Ex. 113–15.) The Warden's recommendation was memorialized in an undated document. (*Id.*) Tate received no prior notice of the Warden's review, nor did he have an opportunity to argue his position or submit evidence prior to the issuance of the Warden's determination. Instead, Tate simply received a notice of the Warden's recommendation. (Reply Br. Ex. 1.) In addition to stating the Warden's recommendation, the notice provided information on appeal procedures. (*Id.*)

On January 5, 2006, Tate appealed the Warden's recommendation to the Bureau of Classification (the "Bureau"). On January 17, 2006, however, before the appeal was considered, Tate was transferred to OSP. (*Id.*) On January 27, 2006, the Bureau issued a determination upholding the Warden's recommendation to transfer Tate to OSP. (Mot. Compel Ex. 116–17.) The Bureau reasoned that, because the RIB rejected Tate's self-defense claim, the Committee was not authorized to review that factual finding and assign a level 4 security placement. (*Id.* at 17.) Neither the Warden nor the Bureau conducted a hearing or otherwise gave Tate an opportunity to be heard before issuing their determinations. On February 19, 2006, the prison officials notified Tate that his

---

1. Rule 1 prohibits "physically or sexually assaultive and/or predatory behavior ... resulting in either serious injury or death to any person, or in an attempt to ... cause serious injury or death to any person." (Mot. to Compel Ex. 15.)

2. The Ohio Department of Rehabilitation and Correction characterizes inmates held at se-

curity level 4 as those who "are involved in, but do not lead others to commit violent, disruptive, predatory or riotous actions, and/or [are] a threat to the security of the institution;" level 5 applies to inmates "who commit or lead others to commit violent, disruptive, predatory, riotous actions, or who otherwise pose a serious threat to the security of the institution." (Reply Br. Ex. 21.)

estimated duration of level 5 security placement was eight to ten years. (*Id.* at 18–19.) Tate refused to accept the proffered paperwork. (*Id.*)

On March 23, 2006, counsel for Tate requested that his security level be restored to level 4 and that he have the option of remaining at OSP or returning to TCI. (Mot. Compel Ex. 2.) On April 5, 2006, Ohio denied the requests. (Reply Br. Ex. 3.) On April 26, 2006, Tate filed the present motion.

## II. Legal Standard

This Court has determined that, in evaluating inmates for transfer to OSP, Ohio must provide procedural safeguards that provide at least as much protection as the policy described by the Supreme Court as Ohio's "New Policy" in *Wilkinson v. Austin*, 545 U.S. 209, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005). (Mar. 21, 2006 Order 20–21.)

Prison inmates may seek judicial redress for "prison circumstances or occurrences" that violate federal law after they exhaust all available institutional remedies. 42 U.S.C. § 1997e(a). *See also Porter v. Nussle*, 534 U.S. 516, 520, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). The Prison Litigation Reform Act ("PLRA") authorizes this Court to issue prospective relief to inmates whose federal rights are violated. 18 U.S.C. § 3626(a)(1)(A). Such relief, however, must be "narrowly drawn," "extend[ ] no further than necessary" and be "the least intrusive means possible" to remedy the violation. *Id.*

Therefore, to the extent that Ohio's policies and practices fail to comport with the holdings of this and other courts, this Court may order relief in accordance with PLRA § 3262(a)(1)(A).

## III. Discussion

Tate asserts that Ohio's placement review procedures violated his Due Process rights. In response, Ohio asserts that Tate's petition is beyond the scope of this motion and that the Court lacks authority to reclassify inmates. The Court addresses each of these issues.

### A. The Scope of this Action Includes Tate's Motion

Ohio argues that, because Tate alleges injury resulting from the application of the New Policy as outlined in *Austin*, he was required to bring this motion to compel in a separate action. (Reply Br. 7–8.) But the placement process at issue here is not the New Policy, nor is it the Modified New Policy described in this Court's March 21, 2006 Order. Rather, it is a third iteration that the Court will refer to as the "Modified New Policy II." This Court's March 21 Order stated that Ohio may modify its policies to permit later reviewers to reverse earlier recommendations against transfer to OSP only if "Ohio affords notice, an opportunity to respond, and a reasoned decision for any subsequent reversal." (Mar. 21, 2006 Order 26.) Tate challenges the constitutionality of the acting policy, i.e., the Modified New Policy II. The constitutional limits of the inmate security placement methods that Ohio implements are within the scope of this Court's continuing jurisdiction. Therefore, Tate's motion is appropriately filed as part of this action.

### B. Constitutional Requirements for Inmate Transfer to OSP

In *Wilkinson v. Austin*, 545 U.S. 209, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005), the Supreme Court described a three-tiered review process that terminated upon any reviewing authority's recommendation against transfer to OSP. 125 S.Ct. at 2396. The Supreme Court held that this process was sufficient to guard against the risk of erroneous placement. *Id.* The Supreme Court noted that the "most important pro-

cedural mechanisms for purposes of avoiding" erroneous placement are exhibited in Ohio's claimed practice of providing inmates with the "factual basis leading to consideration for OSP placement" and an opportunity to respond to those allegations. *Id.*

In its March 21, 2006 Order, this Court recognized that Ohio is not strictly bound to the method that it described to the Supreme Court in early 2005. (Mar. 21, 2006 Order 22–23.) Nonetheless, this Court held that any modifications must afford inmates the same level of Due Process as those procedures described by the Supreme Court. (*Id.*) This Court further held that "no subsequent reviewer ... shall overturn the recommendation against placement/retention unless Ohio affords notice, an opportunity to respond, and a reasoned decision for any subsequent reversal of an earlier recommendation against placement at OSP." (*Id.* at 26.)

As is its prerogative, Ohio has chosen to modify its security placement review procedures from those the Supreme Court described in *Austin.* 125 S.Ct. at 2395–96. Tate generally alleges that this review process, as applied to his security placement, falls short of required Due Process procedures. (Mot. Compel 9.) Essentially, Tate supports his position with three arguments. First, Tate says he was not afforded notice or a hearing before the Warden reversed the Committee's determination. (*Id.*) Second, Tate asserts that neither the Warden nor the Bureau provided the requisite "well-reasoned decision" when they reversed the Committee's recommendation against transfer to OSP. (*Id.* at 10–11.) Third, he argues that Ohio's post-transfer review process lacks sufficient Due Process.

In response, Ohio argues that Tate's notification and opportunity to appeal before the Bureau's review satisfies Due Process and that both the Warden's and the Bureau's reports were reasoned decisions that support their reversal of the Commission's recommendation. (Reply Br. 3–7.) For the reasons described below, this Court agrees with each of the Petitioner's three contentions.

1. The Review Process At Issue Fails To Protect Inmates' Due Process Rights.

As the Supreme Court recognized, notice and a fair opportunity to be heard are "among the most important procedural mechanisms for purposes of avoiding" erroneous placement. *Austin,* 125 S.Ct. at 2396.

i. *Notice and Opportunity To Be Heard at Every Level*

■ The Supreme Court implied that Due Process requires affording inmates an opportunity to be heard at any point at which their security placement may be increased. *Austin,* 125 S.Ct. at 2396. Ohio's previous approach terminated the review process immediately upon a single recommendation against placement at OSP. Therefore, the Supreme Court obviously did not articulate the Due Process requirements after such a recommendation. However, Ohio chose to alter its approach such that a subsequent reviewer may reverse a recommendation against placement, so increased safeguards are necessary. If Ohio permits later reviewers to reverse a recommendation against OSP placement, the process due to inmates upon review must increase: full Due Process requirements attach to each reviewer who has the authority to increase an inmate's placement level.

■ In this case, Tate received no notification of the Warden's intent to review the Committee's determination and he was afforded no opportunity to contribute to the review through a written appeal or a

hearing. Tate was thus deprived of the ability to participate in judgments that impacted his liberty interest in avoiding erroneous transfer to OSP. Accordingly, each level of review must follow full notice and hearing procedures.

Ohio asserts that it satisfied Due Process because Tate was able to file an appeal to the Warden's determination before the Bureau issued its decision. (Reply Br. 3.) This process is insufficient.[3] Notice and an opportunity to be heard on a decision implicating a liberty interest are meaningless where, as here, the notice and hearing opportunity occur *after* the decision is already made. Inmates must be afforded full opportunities of notice and hearing whenever a reviewing entity is considering an action or recommendation that implicates their liberty interest.

This determination is consistent with the Supreme Court's assessment of the *Mathews* balancing factors.[4] As the Supreme Court held, an inmate's interest in avoiding erroneous placement at OSP is high, particularly because such placement prevents consideration for parole. *Austin,* 125 S.Ct. at 2389. The Supreme Court recognized that the placement procedures guard against erroneous placement, *id.* at 2395, but Ohio's interest in maintaining safe and secure prison facilities requires that prison management decisions receive substantial deference. *Id.* at 2397. Although Ohio has the authority to modify its procedure, the modified procedure must still comport with the Due Process requirements of notice and opportunity to be heard. The increased risk of erroneous placement that may result from allowing reviewers to reverse earlier decisions requires extra protection, i.e., full notice and hearing procedures at all levels of review.

### ii. Deference Afforded Lower Decision Makers

The degree of deference that reviewing bodies give to lower decision makers also implicates inmates' Due Process rights. The Bureau's review incorrectly concludes that the Commission lacked the authority to assign Tate a level 4 security placement because the RIB rejected Tate's self-defense claim and "[c]lassification decisionmakers do not have the authority to rehear issues already decided in a prior disciplinary proceeding." But to afford Due Process, the RIB's rejection of Tate's self-defense claim should not be determinative of the appropriate security placement. The determination that Tate did not act in self-defense simply means that a Rule was broken, not that his security placement level must increase. Moreover, the RIB's determination is merely one of several events that may trigger a Commission review.[5] That finding cannot be, as the Bureau treated it, a conclusive determination of the threat the inmate poses to prison security. If the RIB's finding constituted an unreviewable dispositive determination of the inmate's placement level, inmates would be stripped of their right to meaningful review. Therefore, reviewers at every level must be free to weigh the RIB's findings however they deem appropriate.

---

3. While this technically accords with the Supreme Court's mandate that inmates have an opportunity to respond to recommendations *for* placement at OSP before the next level of review, that rule was premised on recommendations *against* placement being conclusive. It would be nonsensical to require notice and opportunity to respond only if the earlier determination is for OSP placement.

4. The individual inmate's liberty interest in combination with the risk of erroneous placement at OSP must be balanced against the State's interest in managing its prisons. *See generally Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

5. Conviction of certain criminal offenses can also trigger security placement review. (Mot. Compel Ex. 16.)

### iii. Transfer to OSP Before Final Determination

The Court next addresses the practice of transferring inmates to OSP before the review process is complete. The Supreme Court noted with approval that inmates were only transferred to OSP *after* the three-step review process was complete. *Austin*, 125 S.Ct. at 2391. As discussed above, while Ohio is free to revise the particulars of its policies, it may not reduce the level of protections provided to inmates below those described to the Supreme Court. (Mar. 21 Order 20–21.) Ohio does not challenge the fact that inmates have a liberty interest in avoiding the harsh conditions at OSP and that liberty interest is not protected when the prison management chooses to transfer inmates before their review process is complete. Moreover, it is conceivable, if not probable, that an inmate's already having been transferred to OSP could influence the decision makers, making it more likely for them to affirm the new status quo. Accordingly, the Court holds that inmates may not be transferred to OSP before their review process is complete and all three reviewers' recommendations have issued.[6]

### 2. The Warden and the Bureau Must Provide Adequate Reasoned Decisions to Justify Their Actions.

■ The Warden's dismissal of the Commission's recommendation without indicating why it was erroneous is the very type of action that prompted this Court to impose the "reasoned decision" requirement. (Mar. 21, 2006 Order 26.) A coherent articulation of the reason for reversing the Committee's determination is necessary to protect inmates from the seemingly arbitrary decision making that this Court and the Supreme Court rejected. *See Austin v. Wilkinson*, 189 F.Supp.2d 719, 745 (N.D.Ohio 2002). The Court requires Ohio to regulate security placement processes to ensure that inmates are afforded some modicum of predictability. This requirement goes to the very heart of Due Process concerns. Here, the Warden simply reiterated all of the RIB's factual findings and assigned Tate to a level 5 security placement. He did so without articulating why the Commission's determination was inadequate or why he believed Tate threatened the safety and security of TCI.[7]

Issuing a decision without any explanation does not constitute a "reasoned decision." (*See* Mar. 21, 2006 Order 27.) Such cursory, opaque adjudication removes much of the benefit of the requisite multiple-tiered review. To reiterate, the constitutional obligation to provide a "reasoned decision" falls on the decision maker at every level. This is especially pertinent where, as here, a higher level reviewer overturns a decision favorable to the inmate.

### 3. Ohio Must Individualize OSP's Post-Transfer Review Methods.

■ Tate challenges the review issued on February 10, 2006, that alleged that he

---

6. In so holding, the Court does not enjoin prison management from placing inmates who present a serious and immediate security threat in individual confinement for the pendency of the review procedures.

7. The Ohio Department of Rehabilitation and Correction lists general guidelines that justify elevating an inmate's security level from 4 to 5 and the contents of the reviewing body's report. Generally, the reviewer's documentation must "clearly reflect" the inmate's inability to function under level 4 restrictions, reflected by repeatedly breaking rules or disrupting the normal operations of the prison unit. The reports from the Warden and the Bureau recommending Tate's transfer to OSP fail to allege repeated violations of the type described in the Department's guidelines. (Reply Br. Ex. 28.)

presents a severe security threat. The Supreme Court considered the review within thirty days of transfer to OSP to be an additional important safeguard against erroneous placement. *See Austin,* 125 S.Ct. at 2391, 2396. As far as this Court can determine from the record documents, Tate's review consisted only of a boiler-plate checklist with a warning that he could "not be managed at a lower level [of security]." This is insufficient, as Tate apparently received no meaningful review of his situation or of the events leading to his assignment to OSP. As stated above, requisite constitutional procedural safeguards are in place to protect inmates from erroneous assignment and to ensure careful individualized review. As with the initial OSP placement decision, Ohio must provide notice, an opportunity to be heard, and a reasoned decision as part of the post-review transfer process.

Ohio asserts that this Court lacks the authority to reset Tate's security placement to level 4. (Reply Br. 8–9.) As discussed above, the Court may not overturn the substantive determinations reached by prison management barring some procedural shortcoming. While this Court may not reverse determinations of threat level, it may enjoin the Defendants from engaging in unconstitutional procedures, and the Court may reverse the results of such procedures until the Defendants provide Due Process.

## IV.   Conclusion

The Court holds that the review methods as applied to Frederick Tate's security placement violated his Due Process rights. Accordingly, this Court **GRANTS** Plaintiffs' Motion to Compel and further **ORDERS** the State of Ohio to return Frederick Tate to TCI for the pendency of a complete rehearing of his security place-

ment using a process consistent with this opinion.

**IT IS SO ORDERED.**