MAKAR, J.,
dissenting..
Thirty-five years of precedent are jettisoned, replaced in part by a pastiche of legal concepts cobbled together to create a newfound remedy, proving the adage that a camel is a horse designed by committee. Neither constitutional text, precedent, nor changed circumstances support the result; conflict and confusion are created where none has existed; and unforeseen, hydra-like consequences are born. Little commends the end product; it’s a solution for a non-existent problem.
Let’s put this en banc case — purportedly of exceptional importance — in context. It is one of a miniscule subcategory of inmate petitions comprising about 0.2% of our annual workload of approximately 5000 cases. About ten times a year, an inmate put in .close management (CM) seeks judicial, review, claiming his placement is so arbitrary or oppressive as to invoke judicial, intervention. Relief is usually denied, sometimes summarily, but not always. The judicial burden of processing these few cases pales in comparison to the avalanche of prisoner petitions processed in this Court[8] and others[9] for which relief is most often denied. See Harvard v. Singletary, 733 So,2d 1020, 1023 (Fla.1999) (“Many prisoner petitions are successive, and a large number are completely without merit.”). From a judicial administration perspective, we face greater challenges than the processing of this lilliputian sliver of our docket.
For over three decades, our precedent has authorized this process, one that has proven neither unworkable nor controversial. See, e.g., Costello v. Strickland, 418 So.2d 443 (Fla. 1st DCA 1982) (granting relief in prisoner’s challenge to CM status raised in a habeas petition). Now, the *1178 Department wants us to depart from our long-standing precedent, eliminating judicial review of its CM decisions entirely. It asks that we abandon an established constitutional remedy, the writ of habeas corpus, which is “granted freely and without cost” and “shall never be suspended,” article I, section 13, Florida Constitution, because using it in the CM context is a “diminution of the Great Writ that must end.”[10] The Department says that the status quo “may have made sense years ago when little was known about the conditions of CM units and allegations of arbitrary placement abounded.” Judicial review of CM challenges should be eliminated, we are told, because CM processes have evolved and become so “modern” as to operate independently of the judicial branch without fear that abuses in prison will occur.
The claim that judicial precedents over the past decades justify overruling our caselaw has no support whatsoever. Nothing in the Florida or United States constitutions has changed; no case from the United States Supreme Court or the Florida Supreme Court in the past thirty-five years suggests that our precedents on this topic should be abandoned; and decisions of our sibling courts are in accord with our precedents. Indeed, no court nationwide has done what the Department asks us to do.
The entire linchpin of the Department’s theory is Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), a twenty-year-old decision that limited — but did not eliminate — judicial review of disciplinary challenges. Sandin specifically left open review where an institution imposes an “atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.” Id. at 484, 115 S.Ct. 2293. Courts nationwide have cited Sandin 16,628 times, but none have read it as ushering in the elimination of judicial review of CM-type assignments. The Department also cites a smattering of cases that purportedly support the total elimination of an inmate’s liberty interest in the CM context, but none specifically do so; and the cases are either unpublished, non-precedential, or they merely support the general concept from Sandin that only atypical and significant conditions create a protectable interest.
Moreover, though debate exists on the baseline of Sandin’ s standard,[11] no debate exists on its application; courts have routinely applied it to decide whether a prison placement falls within its parameters. The United States Supreme Court has done so. See, e.g., Wilkinson, 545 U.S. at 223, 125 S.Ct. 2384 (concluding that “assignment to [Supermax prison] imposes an atypical and significant hardship under any plausible baseline”). And, indeed, we’ve applied it a number of timés and found it workable. See, e.g., John v. Crews, 149 So.3d 149, 151 (Fla. 1st DCA 2014) (“Based on Sandin, appellant’s placement in disciplinary confinement for forty-three days did not present an atypical, signifi *1179 cant deprivation implicating the protections of the due process clause”).
Simply said, no precedent supports a deviation from stare decisis; no flawed logic has been shown; and recasting the status quo in another form serves no purpose. Our precedents have not thrust us into “improper judicial second-guessing” of governmental actions, whether dangerous or otherwise, as the Court believes; nor have they — as the Court claims — “eneour-age[d] excessive state judicial oversight and interference with prison management, without any real substance at stake or real benefit conferred on state prisoners while creating a risk of diminishing state prison security and safety.” Maj. Op. at 1162. Not a single instance has been brought to our attention to support the claim that the judges of this Court or any other have acted improperly or, through' excessive oversight, interfered with prison operations for no good reason.
And no “changed circumstances” warrant the exercise of en banc powers to overturn our caselaw. While it is highly laudable that Florida’s prison system has adopted additional rules, procedures, and protocols for CM assignments, which are said to be solely non-punitive management tools, that does not logically mean that courts should fold up their tents and fore-go judicial review, particularly under separation of powers principles. Courts exist to protect rights, and no law or tradition exists to abdicate that responsibility absent the most compelling of justifications. We are in the business of reviewing governmental actions that may impinge on people’s rights; administrative deference, not judicial abdication, is what’s due.
What’s more, the United States Supreme Court has made clear that the determination of an inmate’s liberty interest is not based solely on what state regulations say (or how numerous and dense they are), but-on the nature of prison conditions imposed relative to prison life generally. The Court explained this point as follows:
After Sandin, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulation's regarding those conditions but the nature of those conditions themselves ‘in relation to the ordinary incidents of prison life.’
Wilkinson, 545 U.S. at 223, 125 S.Ct. 2384 (citation omitted) (emphasis added). Thus, contrary to thé Department’s (and the Court’s) view that inmates “do not have a liberty interest in their custody status while in' prison,” it is clear they do, albeit more narrowly circumscribed. We are in no position to overrule the United States Supreme Court on this point. And the high court has clearly said that facial readings of prison regulations are not the touchstone; instead, it is the nature of the actual conditions imposed. This makes sense because of the improbability of a state promulgating prison regulations that facially impose atypical, significant restrictions.
A few final observations. First, the Court concedes that by overturning longstanding precedent- it creates conflict with our sibling courts and potentially our supreme court. The result is a judicial outlier in a sea of precedent to the contrary; no court anywhere has read Sandin as does this Court. We will be seen as straining to- squeeze juice from Sandin’s timeworn rind, overplaying its significance, and altering our caselaw for no good reason. Second, the Court’s lengthy opinion and new-fangled remedy, much like a Rube Goldberg machine, are over-engineered to perform what has been a simple, uncomplicated, and non-controversial task; *1180 they will likely create unnecessary confusion and have the unintended consequence of increased prisoner litigation. It is said the new remedy specifically does not displace existing review via a petition for a writ of habeas corpus based on prison conditions in the CM system. Thus, inmates will now file two petitions, one seeking mandamus.to review the CM placement decision, and another seeking a writ of habeas corpus to review the conditions of CM. This will undoubtedly result in more burdens on judicial administration, not fewer. And prisoners who pursue the new remedy, if indigent, as most are, will impose further burdens due to the process and paperwork necessary to waive filing fees in this new class of cases. Finally, courts have a role to play in making the law understandable and efficient; we accomplish neither in this case. If it ain’t broke, don’t _fix.it. .

. In 2015, 1079 original criminal petitions were filed in this Court, the bulk of which involve inmates seeking extraordinary writs. This number has been approximately 1000 petitions annually since 2011.

. In 2015, 691 original criminal petitions were filed in the- Florida Supreme Court seeking extraordinary writs. .This exceeds the.500 mentioned in its decision in Harvard v. Singletary, 733 So.2d 1020 (Fla.1999).

. Sight should not be lost that the writ was originally judicially-created specifically as "an instrument by which [judges] supervised imprisonment orders made anywhere, by anyone, for any reason.” Paul D. Halliday, Ha-beas Corpus: From England to Empire 9 (Harvard University Press 2010). It exists as the quintessential writ by which judges are to hear the pleas of any and all who are imprisoned.

. Wilkinson v. Austin, 545 U.S. 209, 223, 125 S.Ct 2384, 162 L.Ed.2d 174 (2005) (“In San-din's wake the Courts of Appeals have not reached consistent conclusions for identifying the baseline from which to measure what is atypical and significant in any particular prison system.”).