*464 OPINION OF THE COURT
Marcy S. Friedman, J.
This is a CPLR article 78 proceeding brought by petitioners Carl Jackson, Alma Torres, Anthony Oddone, Angel Reyes, and Robert O’Connell, prisoners who are or were confined in what are known as “close custody” housing areas in various New York City jails operated by the Department of Correction (DOC), through its Commissioner, respondent Martin Horn. The petition alleges that the DOC exceeded its authority by locking close custody inmates in their cells for up to 23 hours per day in violation of Board of Correction (BOC) Minimum Standards (40 RCNY) § 1-05, which regulates the length of time a prisoner may be confined to his or her cell in a 24-hour period. Petitioners seek a declaratory judgment and mandamus relief enjoining the DOC from confining close custody inmates to their cells for more than 10 hours per day.
Regulatory Framework
New York City Charter § 626 (e) provides that the BOC “shall establish minimum standards for the care, custody, correction, treatment, supervision, and discipline” of all prisoners confined by the DOC. The DOC does not dispute that it is bound by the BOC’s Minimum Standards. The BOC first adopted Minimum Standards for New York City correctional facilities in 1978. For many years, the Minimum Standards remained substantially unchanged except as to provisions, not here relevant, regarding overcrowding, law libraries, and the variance process, which were amended in 1985. In June 2005, the Minimum Standards Committee of the BOC was reconstituted and began a review process to amend the Minimum Standards. Proposed amendments were published on January 19, 2007. A public hearing on the proposed amendments was held on April 17, 2007, and amendments were adopted by the BOC on November 8, 2007. These amendments are reflected in a notice issued by the BOC, entitled “Notice of Adoption of Amendments to the Minimum Standards for New York City Correctional Facilities.” (Petition, exhibit 2.)
Minimum Standards § 1-02 (b) (1) enumerates categories of prisoners. Section 1-02 (e) (1) requires the DOC to employ a security classification system to group prisoners according to the minimum degree of surveillance and security required. Section 1-02 (e) (2) (v) provides that “[prisoners placed in the most restrictive security status shall only be denied those rights, privileges and opportunities that are directly related to their status *465 and which cannot be provided to them at a different time or place than provided to other prisoners.” This section was not altered by the 2007 amendments.
Minimum Standards § 1-05 sets forth the maximum time that prisoners may be locked in their cells. Section 1-05 (a) articulates the BOC’s policy as follows: “The time spent by prisoners confined to their cells should be kept to a minimum and required only when necessary for the safety and security of the facility.” Section 1-05 (b) sets the “[i]nvoluntary lock-in” maximum times, and provides that no prisoner shall be locked in at night “for count or sleep” for more than eight hours in any 24-hour period (§ 1-05 [b] [1]), and no prisoner shall be locked in during the day for more than two hours in any 24-hour period. The section exempts two enumerated categories of prisoners from the involuntary lock-in maximum, and thus states: “The provisions of this section are inapplicable to prisoners confined in punitive segregation or prisoners confined for medical reasons in the contagious disease units.” (40 RCNY 1-05 [a].)
The exemption from the involuntary lock-in maximum for these two categories of prisoners was adopted by the BOC as part of the 2007 amendments. As noted in the BOC’s notice of adoption, this exemption reflected a long-standing “variance” or practice regarding confinement of these two categories of prisoners. (See petition, exhibit 2, at 4.) In contrast, the exemption was not adopted for close custody inmates.[1] As stated in the notice of adoption, “[t]he Board rejected a proposal to further amend subdivision (a) to exclude . . . prisoners who are confined in close custody.” (Id.)
*466 Close Custody Housing
The DOC’s procedures for placing inmates in close custody were initially implemented by a directive issued in 2005, as amended by DOC Directive 6006R-D (available at http://prtlprd-web.nyc.gov/html/doc/downloads/pdf/6006R-D.pdf, cached at http://www.nycourts.gov/reporter/webdocs/6006R-D.pdf), effective May 28, 2009 (answer, exhibit A). According to respondent, close custody housing is “designed to protect vulnerable inmates (and in a smaller number of cases, to separate certain predatory inmates) who can not safely be held in General Population, or in another less restrictive housing unit than Close Custody.” (Id. 1f 37.) Close custody is the DOC’s “most restrictive security status,” and is comprised of two categories of inmates. (Aff of Frank Squillante [DOC Assistant Chief for Special Operations] If 2.) The first is close custody/protective custody (CC/PC), in which most inmates are placed at their own request, or occasionally involuntarily, because their safety would be at risk if they were to be placed in the general population. (Id. 1Í 4.) These inmates include prisoners who were charged with a violent sex or hate crime, child abuse, or child homicide; inmates, including gay and transgendered inmates, who are themselves victims of attacks from other inmates; cooperating witnesses; and inmates placed in protective custody because of their identity, e.g., their status as celebrities or in law enforcement. (See id. 1f 5.) The second category of inmates, termed non-protective custody/close custody housing (non-PC/CCH), includes inmates who pose a serious threat to security — for example, inmates who committed violent acts while previously incarcerated, are known gang members, or are known to have a propensity for violence. (Id. If 6.)
The number of inmates in close custody/protective custody housing is significantly greater than the number in non-protective custody/close custody housing. Between September 2005 and March 2009, 702 inmates were placed in CC/PC while 197 were placed in non-PC/CCH. (Squillante aff 11 7.) The number of inmates in close custody housing — whether CC/PC or non-PC/CCH — is a “tiny fraction” of the approximately 13,000-13,500 average daily population of inmates in city custody. (Id. 1Í 7; answer If 44.) According to the most recent figures submitted to the court in this proceeding, as of May 2009, there were 42 inmates in CC/PC and 30 in non-PC/CCH. Of the 42 inmates in CC/PC, all but three were placed voluntarily. (Answer 1f 44.)
As of the date of his or her affidavit, each petitioner had been placed in close custody housing for the following approximate *467 lengths of time: Anthony Oddone for a period of eight months (petition, exhibit 5); Angel Reyes — two months (id., exhibit 6); Robert O’Connell — one month (id., exhibit 20); Carl Jackson — 15 months (id., exhibit 21); and Alma Torres — 22 days (id., exhibit 22). The DOC contends that “inmates generally do not stay in Close Custody for long.” (Squillante aff 1Í 8.) In support of this contention, it cites statistics showing that as of April 2009, 69 inmates were discharged from CC/PC. Of these, 52 (or 75%) had been in CC/PC for one to six days after their initial two-day review period, an additional eight (or 11.6%) had been in CC/PC between 7 and 27 days, and only four had been in CC/PC for 56 days or longer. (Id.) These statistics do not account for the remaining five of the 69 discharged inmates, and do not show the length of confinement of CC/PC inmates who were confined as of April 2009 and not discharged in that month. It thus appears that while close custody placement will generally not be lengthy, there are significant numbers of lengthy placements. Moreover, the DOC does not dispute that placement in close custody may be indefinite, although the DOC’s procedures require review within two business days after the initial placement to determine whether continued placement is necessary (DOC Directive 6006R-D § III [D]); afford hearings to inmates who contest placement (id. § III [E]); and provide for review of placement every 28 days. (Id. § III [F].)
The DOC Directive further requires that close custody housing inmates shall “receive mandated services and programs consistent with General Population (GP) services and programs with the exception that such services and programs are to be received in a non-congregate setting unless otherwise authorized.” (Id. § IV [D] [3].) These programs and services include, among others, telephone calls, meals, access to law library materials, religious services, counseling, and access to educational services. (Id.; answer 1Í 46.) Under DOC Directive 6006R-D § TV (D) (3) (g), which governs out-of-cell time, close custody inmates “shall be escorted to outside recreation individually and be placed into an Individual Recreation Area (IRA) where [they] will recreate for a minimum of one (1) hour.”
It is undisputed that not only convicted inmates, but inmates who are awaiting trial, may be placed in close custody housing. It is also undisputed that inmates who voluntarily request placement in close custody for their own safety are treated in the same manner as inmates who are involuntarily placed in close custody as a result of prison misconduct or a propensity for *468 violence. As the DOC acknowledges, all inmates in close custody are housed in cells and “kept separate from one another.” (Answer 1f 46.) While the DOC emphasizes that close custody inmates receive the same services as inmates in the general population, the DOC also acknowledges that the services are “generally provided to them in their cells, rather than in congregate areas of the facility such as a law library or chapel.” (Id.) The DOC stresses that close custody inmates are permitted to have “visual and verbal communication” or “sight and sound interaction” with each other (id. 1Í1Í 64, 66), and that the staff have “discretion” to allow inmates to congregate physically in the day room. (Id. If 47; DOC Directive 6006R-D § IV [D] [3] [g].)
Although the DOC cites the discretion of staff to permit inmates to congregate physically, it does not dispute petitioners’ contention that many close custody inmates are in fact confined to their cells for up to 23 hours per day. For example, petitioner Angel Reyes, who was involuntarily placed in close custody because he was stabbed while in jail, submits an affidavit attesting that while in close custody, he was “locked in a cell continuously during the day and night” and was “allowed out of the cell for one hour a day for outdoor recreation, which is held [in] individual cages with no room or equipment for exercise.” (Reyes aff If 3 [petition, exhibit 6].) He further attests that he was
“allowed one hour per day in the day room to watch television in one of six individual, locked cubicles that [are] about 4x5 feet and are smaller than my cell. Otherwise I am only allowed out of my cell for the time it takes to take a daily shower and, whenever it happens, to go to court, to see a visitor or to go to the medical clinic. I must receive all other programs or services in my cell, including food, library and religious services.” (Id.)
Petitioner Anthony Oddone, who was involuntarily placed in close custody while awaiting trial because of the high profile nature of his case, describes his confinement in identical terms. Petitioner Alma Torres, who voluntarily sought placement in close custody after she claimed to have been assaulted by a correction officer, attests that she was
“allowed out of my cell each day only for about 20 minutes for a shower, for one hour to pace the hallway, and for one hour of recreation. Recreation is ‘outdoor’ but Close Custody inmates . . . are put *469 into individual cages that are like ‘square little boxes’ with a solid lid on it that blocks the sky.” (Torres aff 1i 4 [petition, exhibit 22].)
The other petitioners describe the circumstances of their close custody confinement in similar terms. (See O’Connell aff [petition, exhibit 20]; Jackson aff [petition, exhibit 21].)
The parties sharply dispute whether close custody is a form of solitary confinement. Petitioners characterize close custody as a form of solitary or “isolation” confinement, and cite the adverse effects of this confinement on their mental health. (Reyes aff 1T 2 [“I feel like I could go crazy in Close Custody”]; O’Connell aff 1i 2 [“I am depressed and suicidal in Close Custody”]; Torres aff 1t 8 [“There are times when I literally go ‘stir crazy’ and I get so depressed that I don’t feel like eating or doing anything but laying down”].) In response, Commissioner Horn submits an affidavit stating that solitary confinement does not exist in the City’s detention facilities and that he does not condone and would not tolerate it. (Horn aff 1Í 9.)
This dispute over the nature of close custody revolves around the extent to which it is punitive and the extent of the isolation it involves. In arguing that close custody housing is not solitary confinement, the DOC stresses that services are provided to close custody inmates — albeit, in their cells, and that the inmates have verbal and visual, though not physical, contact. Petitioners, in contrast, emphasize that inmates may be confined in cells up to 23 hours per day and that, while they have visual or verbal contact, they do not have physical contact or the ability to congregate outside of cells (i.e., the cells to which they are individually assigned or the separate individual cells provided for recreation or exercise).
Petitioners cite legal authority that establishes inmates’ constitutionally protected liberty interest in avoiding assignment to facilities in which they may be confined for up to 23 hours per day. (See Wilkinson v Austin, 545 US 209 [2005].) They also cite substantial legal and scientific authority which recognizes the adverse mental health effects that may be caused by such confinement. (See e.g. Madrid v Gomez, 889 F Supp 1146, 1230 [ND Cal 1995], cert denied sub nom. Wilson v United States Disk Ct. for E. Dist. of Cal., 520 US 1230 [1997] [“Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances. These include *470 perceptual distortions, hallucinations, hyperresponsivity to external stimuli, aggressive fantasies, overt paranoia, inability to concentrate, and problems with impulse control”]; Davenport v DeRobertis, 844 F2d 1310 [1988], cert denied 488 US 908 [1988]; Grassian, Prison Reform: Commission on Safety & Abuse in America’s Prisons: Psychiatric Effects of Solitary Confinement, 22 Wash U JL & Pol’y 325, 327 [2006] [summarizing psychiatric literature on solitary confinement and concluding that “confinement of a prisoner alone in a cell for all, or nearly all, of the day with minimal environmental stimulation and minimal opportunity for social interaction() can cause severe psychiatric harm”].) While the case law generally involves supermax or maximum security prisons in which 221/2-to-23-hour-per-day confinement is combined with other severely restricted conditions (e.g., cells that are windowless or afford no views of other prisoners), it has been recognized that “isolating a human being from other human beings year after year or even month after month can cause substantial psychological damage, even if the isolation is not total.” (Davenport, 844 F2d at 1313.)
While the DOC disputes the characterization of close custody as solitary confinement, it does not seriously dispute the considerable degree of isolation close custody imposes, and the potentially “negative effect arising out of a Close Custody security classification.” (See answer 1i 64.) On the contrary, the DOC highlights its procedures to monitor the mental health of close custody inmates, including that “[m]ental health staff speak to every inmate every day to ascertain if they require additional mental health attention,” and inmates on suicide watch are seen twice daily by a clinician. (Answer 11 68; aff of Erik Berliner [DOC Assistant Commissioner for Health Affairs and Forensic Services] U 5.) The DOC also cites the extensive screening it performs before placing inmates into close custody, including prior mental health assessments (DOC Directive 6006R-D § III [B]), its requirement that initial placements be reviewed within two business days to determine whether continued placement is necessary {id. § III [D] [1]), and its mandatory review of placement every 28 days. {Id. § III [F].)
Discussion
Petitioners contend that BOC Minimum Standards § 1-05 expressly addresses maximum lock-in times for inmates and applies to all prisoners except those it explicitly exempts — namely, prisoners in punitive segregation and prisoners confined for medical reasons in the contagious disease units. Petitioners fur *471 ther cite the BOC’s 2007 rejection of a proposed amendment of Minimum Standards § 1-05 to exempt close custody prisoners from the maximum 10 hours per day lock-in. They conclude that the DOC has refused to perform a duty required by law, by continuing to apply the Commissioner’s close custody directive and thus subjecting inmates to more than 10 hours and up to 23 hours per day of involuntary confinement, in violation of section 1-05. (Petitioners’ mem at 3-4, 8-11.)
The DOC does not dispute that it is obligated to comply with the Minimum Standards set by the BOC. Rather, it contends that the section 1-05 lock-in restrictions are not applicable to close custody housing, and that the DOC’s authority for close custody housing derives from section 1-02, which “expressly authorizes the Department to categorize inmates by security classification and, for those inmates subject to the ‘most restrictive security status,’ to limit the method of providing those inmates’ rights, privileges and opportunities that are directly, related to their [security classification] status.” (Respondent’s mem at 11.) The DOC asserts that section 1-02 “contemplates, and authorizes, the kind of cell-based, or otherwise segregated, delivery of services utilized in Close Custody housing— particularly where, as here, no services otherwise available to GP inmates are being denied.” (Id. n 3.)
In response, petitioners contend that section 1-02 “says nothing about lock-in and lock-out times, but only addresses when and where programmatic services can be delivered to inmates in restrictive security status.” (Petitioners’ reply mem at 5.) They note, in contrast, that section 1-05 “deals explicitly with lock-in times and applies to all prisoners except” the two exempted categories. Petitioners submit that the more specific standard controls. (Id. at 6.)
Resolution of this proceeding turns on interpretation of the regulatory framework. In particular, the issue before this court is whether Minimum Standards § 1-05 precludes the DOC from confining close custody inmates to their cells for more than 10 hours per day or whether this procedure is authorized by Minimum Standards § 1-02.
The power of the BOC to establish minimum standards is “a quasi-legislative power.” (Legal Aid Socy. v Ward, 91 AD2d 532, 532 [1st Dept 1982], affd on other grounds 61 NY2d 744 [1984].) The BOC’s Minimum Standards are thus subject to the rules governing construction of statutes. It is well settled that “when the statutory language is clear and unambiguous, it should be *472 construed so as to give effect to the plain meaning of the words used.” (People v Finnegan, 85 NY2d 53, 58 [1995] [internal quotation marks, citations and brackets omitted], rearg denied 85 NY2d 968 [1995], cert denied 516 US 919 [1995].) “The task in interpreting a statute or ordinance is to give effect to the intent of the body which adopted it. . . and constru[e] the various parts of the statute or ordinance ‘in a manner seeking to harmonize the whole and avoid rendering any part surplus-age.’ ” (Matter of Briar Hill Lanes v Town of Ossining Zoning Bd. of Appeals, 142 AD2d 578, 581 [2d Dept 1988], quoting Matter of Kamhi v Planning Bd. of Town of Yorktown, 59 NY2d 385, 391 [1983]; see also Iazzetti v City of New York, 94 NY2d 183, 189 [1999].) Where a statute contains both specific and general provisions regarding the same subject matter, the specific provision controls. (See People v Mobil Oil Corp., 48 NY2d 192, 200 [1979]; New York State Crime Victims Bd. v T.J.M. Prods., 265 AD2d 38, 46 [1st Dept 2000].)
Here, as petitioners correctly argue, Minimum Standards § 1-05 explicitly sets forth maximum lock-in times for prisoners, and by its terms applies to all prisoners except prisoners in punitive segregation and in contagious disease units. In contrast, Minimum Standards § 1-02 does not mention lock-in procedures or restrictions. Minimum Standards § 1-02 (e) (2) (v) provides generally that close custody inmates “shall only be denied those rights, privileges and opportunities” that are both directly related to their security status and “cannot be provided to them at a different time or place than provided to other prisoners.” It is from this language that the DOC makes the inferential leap that section 1-02 authorizes the provision of services to close custody inmates in their cells, and permits them to be locked in for up to 23 hours to receive such services. This inference is not only unsupported by anything in the language of section 1-02, but ignores that the BOC has promulgated a specific Minimum Standard that sets forth the maximum lock-in times for all prisoners except those who are expressly exempted.[2] The reading of section 1-02 that the DOC adopts — namely, that it *473 authorizes virtually all services (such as meals, religious services, and counseling) to be provided to inmates in a cell over a period of up to 23 hours per day — plainly violates the lock-in máximums specified by section 1-05. Moreover, sections 1-02 and 1-05 are readily harmonized. Section 1-02, construed according to its terms, authorizes the DOC to provide services to close custody inmates at a different time and place than services are provided to general population inmates, but in a manner consistent with the maximum lock-in times prescribed by section 1-05 — for example, by providing at least some services to close custody inmates outside their cells but within the close custody housing area or cellblock, rather than in the general population areas. The DOC’s contrary interpretation that section 1-02 authorizes it to circumvent section 1-05 therefore cannot stand.
In so holding, the court rejects the DOC’s apparent contention that petitioners are not entitled to relief under section 1-05 because the BOC did not decide on the merits to reject an amendment to exempt close custody inmates from the maximum lock-in times set forth in section 1-05. The transcript of the BOC hearing on this amendment indicates that the initial proposal before the BOC was to amend section 1-05 to exempt from the maximum lock-in times prisoners confined in punitive segregation, close custody, or a contagious disease unit. (Transcript of Nov. 8, 2007 BOC meeting on proposed amendments at 91 [BOC meeting tr], answer, exhibit B.) After a number of BOC members expressed concerns about exposing inmates with “legitimate concerns” for their own safety to 23-hour isolation, or treating them like prisoners in punitive segregation {id. at 96), the BOC adopted an amendment to vote on an exemption only for prisoners in punitive segregation and contagious disease units. {Id. at 96-97.) The DOC correctly argues that the BOC appears to have left open the possibility of a future exemption for close custody inmates. {See id.) Significantly, however, as petitioners correctly argue, by voting an exemption only for prisoners in punitive segregation or a contagious disease unit, the BOC left in place maximum lock-in times that apply to all other prisoners, including prisoners in close custody.
*474 Conclusion
For the above reasons, the court holds that petitioners are entitled to a declaratory judgment determining that the DOC’s close custody housing program violates BOC Minimum Standards § 1-05, and that the DOC is obligated to comply with section 1-05. The Minimum Standards, including section 1-05, are legal mandates with which the DOC, through its Commissioner, is duty-bound to comply. Put another way, the DOC lacks discretion to decide whether or not to comply with Minimum Standards § 1-05.
The court emphasizes that its holding is only that the DOC must comply with Minimum Standards § 1-05. It is not for the court to weigh correctional policies, to select among different possible means for providing services to close custody inmates outside their cells, or otherwise to supervise the manner in which the Commissioner effects compliance with this Minimum Standard. The manner in which compliance with the Minimum Standards is to be effected implicates the security of the prison facility and the safety of prisoners and staff, matters that are within the expertise of the Commissioner, and will remain subject to his judgment and exercise of discretion. (See Klostermann v Cuomo, 61 NY2d 525, 539 [1984].)
The court turns to the more difficult issue of whether it should grant not only declaratory but also mandamus relief. It is well settled that “[a] party seeking mandamus must show a ‘clear legal right’ to relief.” (Matter of Brusco v Braun, 84 NY2d 674, 679 [1994] [citations omitted].) Mandamus may be issued to compel a body or officer “to execute its statutory duty.” (See Klostermann, 61 NY2d at 539.)[3] However, issuance of relief in the nature of mandamus “lies in the discretion of the court in light of equitable principles.” (Matter of New York Pub. Interest Research Group v Dinkins, 83 NY2d 377, 386 [1994].)
As discussed above and as the DOC acknowledges, all close custody inmates, whatever their status, are subjected to the most severe isolation imposed in the New York City prison system. The close custody program does not distinguish between pretrial detainees and convicted inmates serving sen *475 tences, between the most vulnerable inmates and. the most predatory, between those convicted of the most serious felonies and those convicted of the most minor offenses, or between those who request voluntary placement due to fear for their own safety and those who are involuntarily placed due to their propensity for violence. The close custody program treats all inmates the same, confining them to cells for up to 23 hours per day.
Notably, in rejecting the recent proposed amendment to exempt close custody inmates from the maximum lock-in times prescribed by BOC Minimum Standards § 1-05, the BOC expressed serious concerns about the fairness of the close custody program. (See BOC meeting tr at 96.) Whether or not close custody is considered to be a form of solitary confinement, an issue the court need not reach, the DOC itself does not seriously dispute that the physical isolation that this protracted confinement involves may have serious adverse effects on the inmates’ mental health.
Although the close custody program was not implemented until 2005, it replaced an existing protective custody program. The differences between the two programs are not addressed on this record. However, it appears to be undisputed that protective custody inmates were not given the benefit of the maximum lock-in times prescribed by BOC Minimum Standards § 1-05, notwithstanding that this standard has been in effect since 1978.[4] Courts are reluctant to grant mandamus relief where confusion in public affairs would result or where the facts that are relevant to the framing of such relief are not fully developed on the record. (See Matter of Ahern v Board of Supervisors of Suffolk County, 6 NY2d 376, 381-382 [1959]; Matter of Cromarty v Leonard, 13 AD2d 275 [2d Dept 1961], affd for reasons stated below 10 NY2d 915 [1961]; Matter of New York State Commn. of Correction v Ruffo, 157 AD2d 987 [3d Dept 1990].) Here, the court cannot overlook that the BOC’s rejection of the proposed amendment to exempt close custody inmates from the maximum lock-in times reflects a change in long-standing correctional policy.
Under these circumstances, the DOC should have the opportunity, prior to issuance of a mandamus order, to formulate a plan for compliance with BOC Minimum Standards § 1-05. As *476 held above, now that the BOC has rejected the proposed amendment and set the policy on the maximum lock-in times for close custody, the DOC does not have discretion not to comply with the BOC’s Minimum Standard. However, the manner in which the DOC effects compliance — that is, the mix of staffing and other security measures that it adopts to secure compliance — is a matter for the sound discretion of the Commissioner, taking into account the security needs of the facility and the safety of inmates, correction officers, and the public.
There is no reason on this record for the court to conclude that the DOC will not voluntarily comply with this court’s declaration of the DOC’s obligations. (See Klostermann, 61 NY2d at 538-539.) On the contrary, as the DOC notes, the inmates in close custody/protective custody constitute only “a tiny fraction” of the prison population — as few as 42 at a given time according to the most recently available statistics. (Answer 11 44.) The DOC has not argued in this proceeding that the expense of providing services to this small number of inmates outside their cells would be prohibitive or even burdensome. Nor has the DOC argued that enhanced staff supervision would be ineffective to address security concerns if close custody inmates were provided services out of cell. Rather, in defending this proceeding, the DOC has rested on the categorical assertion, unexplained and unsupported by any empirical showing, that “congregate ‘protective custody’ is not a viable option.” (Squillante aff If 25.)[5] In the face of the BOC’s rejection of this position, however, the DOC can be expected to comply with the BOC Minimum Standards with which it acknowledges it is obligated to comply. Finally, it is to be hoped that the BOC, as the *477 body charged with promulgating standards for the confinement of prisoners, will take the opportunity to renew its consideration of the confinement policy for close custody inmates and to set more detailed standards.

. The DOC supported the amendment. However, it noted that while it had proposed the amendment for the contagious disease unit, the Board had proposed the amendment for close custody inmates. (See DOC comments on BOC’s proposed amendments, petition, exhibit 19.) Petitioners annex the comments on the proposed amendments of various advocacy groups interested in prison reform. These comments included those of the Legal Aid Society which detailed court decisions acknowledging, and scientific and medical literature documenting, the negative psychological effects on inmates of solitary confinement or of “isolated confinement” for 23 hours per day. (Petition, exhibit 8.) The comments also included those of Amnesty International, the Sylvia Rivera Law Project, and Lambda Legal, expressing concern that the proposed amendment for close custody prisoners would have a disproportionate impact on lesbian, gay, bisexual, and transgender detainees seeking protection from other inmates. (Petition, exhibits 10, 12, 15.) The DOC does not cite, and the record does not include, comments, other than the DOC’s own, in favor of the amendment.

. The DOC asserts that the section 1-05 lock-in provisions are not applicable to close custody prisoners because section 1-05 “applies to inmates categorized not by security classification, but by disciplinary or medical status — i.e., Punitive segregation inmates and those with contagious diseases.” (Respondent’s mem at 11 [emphasis omitted].) The DOC not only submits no support for the claim that punitive segregation is not a security classification but, elsewhere, inconsistently represents that it is such a classification: In arguing that close custody housing complies with Minimum Standards § 1-02 *473 (e) (2) (ii), the DOC represents that it uses a classification system with at least two classification categories, one of which is punitive segregation. (Respondent’s mem at 10.)

. As the Court of Appeals has explained, a distinction must be made between “acts the exercise of which is discretionary” and “acts which are mandatory but are executed through means that are discretionary.” (Klostermann, 61 NY2d at 539.) Thus, a proper function of mandamus is “to compel acts that officials are duty-bound to perform, regardless of whether they may exercise their discretion in doing so.” {Id. at 540.)

. It is noted that, with certain exceptions, protective custody inmates in New York State, as opposed to City, facilities are required to be afforded a minimum of three hours per day out-of-cell time. (7 NYCKR 330.4 [a]; 330.5.)

. The DOC’s only support for this assertion is a reference to an “unsuccessful” experience with a “gay housing” program which the DOC states was intended to be a form of congregate protective custody. Noting that there were more incidents of use of force and of contraband finds in gay housing than in the general prison population, the DOC attributed the greater incidence to the facts that transfers into gay housing “were not as tightly restricted as other housing assignments,” and that divergent classifications were housed together. (Squillante aff H 25.) In contrast, the DOC asserts that it undertakes extensive screening before placing any inmate in close custody even when placement is voluntarily requested, and that it carefully reviews continuing placement. (See DOC Directive 6006R-D § III [A]-[C] [specifying detailed placement criteria]; [D]-[F] [providing hearings to inmates on placement, and review of placements every 28 days by the Chief of Facility Operations or designee].) There is therefore no showing on this record that the manner in which assignments were made to “gay housing” is comparable to the tightly controlled manner in which the DOC represents that it makes placements into close custody, or that congregate custody in the two programs would be comparable.