# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-3613
_____

Craig Eugene Smith

*Plaintiff  Appellant*

v.

James McKinney; Kelly Holder; Leslie Wagers; Niki Whitacre; Jonathan Janssen

*Defendants  Appellees*
_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines
_____

Submitted: December 10, 2019
Filed: March 31, 2020
_____

Before SMITH, Chief Judge, LOKEN and GRASZ, Circuit Judges.
_____

SMITH, Chief Judge.

Craig Eugene Smith brought suit under 42 U.S.C. § 1983 against prison officials with the Iowa Department of Corrections (IDC),[1] alleging violation of his

---

[1]Smith named as defendants then-Ford Dodge Correctional Facility (FDCF) Warden James McKinney; FDCF Captain Kelly Holder; FDCF Correctional Officer

due process rights in connection with discipline imposed on him. The prison officials moved for summary judgment, and the district court[2] granted the motion. The district court determined that "no reasonable juror could conclude Smith suffered an atypical and significant deprivation in relation to the ordinary incidents of prison life"; as a result, Smith could not "show he had a liberty interest at stake that required due process protections." *Smith v. McKinney*, No. 4:16-CV-00646-RP-HCA, 2018 WL 10483966, at \*4 (S.D. Iowa Sept. 26, 2018). We affirm.

## I. *Background*

In 1994, Smith was convicted of first-degree murder in Iowa state court and sentenced to life imprisonment. From April 4, 1995, to December 3, 2012, Smith was incarcerated at the ISP, a maximum security facility. Smith was transferred to the FDCF, a medium security facility, on December 4, 2012.

In May 2014, FDCF Captain Kelly Holder received a complaint from confidential sources against Smith brought under the Prison Rape Elimination Act (PREA).[3] Holder notified Smith that he would be placed in administrative segregation pending the investigation into Smith's alleged inappropriate sexual contact with other inmates.

---

Leslie Wagers; FDCF Correctional Officer Jonathan Janssen; and IDC Administrative Law Judge (ALJ) Niki Whitacre. Smith also sued Iowa State Penitentiary (ISP) Warden Nick Ludwick; however, the court dismissed Ludwick as a defendant after a suggestion of death was entered upon the record.

[2]The Honorable Robert W. Pratt, United States District Judge for the Southern District of Iowa.

[3]Holder was trained in conducting PREA investigations.

Holder conducted an investigation into the complaint from May 28, 2014, through June 4, 2014. On June 4, 2014, Holder wrote Smith a disciplinary notice for the alleged conduct. FDCF Correctional Officer Leslie Wagers approved the notice, and FDCF Correctional Officer Jonathan Janssen served Smith with the notice on June 12, 2014. Janssen also investigated the allegations set forth in the disciplinary notice. The notice was based on confidential information from several sources.

Smith requested to speak with Correctional Counselor Stacy Mooney. On June 13, 2014, Smith spoke with Mooney and denied the allegations. He also told Mooney that "he would be willing to hurt an innocent person." Defs.' App. to Mot. for Summ. J. at 75, *Smith v. McKinney*, No. 4:16-cv-646-RP-HCA (S.D. Iowa Oct. 10, 2017), ECF No. 20-3.

On June 18, 2014, IDC ALJ Niki Whitacre conducted a hearing on the disciplinary notice. During the hearing, Smith again denied the allegations. He wanted to see the confidential information against him. Whitacre denied his request. Smith responded angrily. Whitacre found Smith guilty of several rule violations. In support of her findings, Whitacre cited the "[d]isciplinary notice dated 06/14/2014 written by Holder; confidential statements/investigation; ICON [Iowa Corrections Offender Network] evidence; and statements by Offender." *Id.* at 76. She imposed a 365 days' loss of earned time, imposed a year of disciplinary detention with credit for 27 days served, and recommended that the prison classification committee transfer Smith back to the ISP for a more secure environment to protect other inmates and staff.

On July 11, 2014, consistent with the ALJ's order, IDC Offender Services transferred Smith back to the ISP for security reasons. On arrival, he was placed in segregation (otherwise known as "disciplinary detention" or the "hole") to serve the remainder of his disciplinary detention. The "Request Comments" in the "Offender Transfer to Institution" form set forth the "[r]eason for transfer" as being "[b]ased on

the nature of the recent violations and Offender SMITH's concerning threats of harming others (see generic note dated 06/13/2014 [entered by Mooney])." *Id.* at 79. The form also set forth Smith's lengthy disciplinary history. Upon Smith's arrival to the ISP, he lost his job, wages, security classification, security points, and inmate tier status. Smith appealed the decision.

On July 30, 2014, then-FDCF Warden James McKinney denied Smith's appeal. In the "Disciplinary Appeal Response," McKinney stated that he had read the confidential information, visited with some of the confidential informants, and found the confidential informants credible. McKinney declined to reduce Smith's sanctions, stating, in part, "[Y]ou were granted an opportunity to move to a medium custody facility. You were immediately moved to the highest level at [FDCF] due to your past history at your previous facility." *Id.* at 81. On September 14, 2014, then-ISP Warden Nick Ludwick denied Smith's supplemental appeal.

On October 9, 2014, Smith filed an action for postconviction relief in the Iowa District Court for Lee County, challenging the PREA adjudication. The state court granted Smith's request for relief. The court explained that when evidence is based on confidential information, the ALJ must prepare a contemporaneous summary of the confidential information for the ICON. But the only summary from Whitacre that the state court received was dated two years after Smith's disciplinary hearing. Whitacre represented that she did not have the summary of confidential information. According to Whitacre, she did not keep case information for more than two years and had just purged her files. The state court found:

> The record before the court is that the ALJ did not prepare any type of independent documentation concerning the confidential information she relied upon until she was requested to do so in connection with this postconviction relief trial. The procedure requiring an ALJ to make a summary of confidential information used by the ALJ

-4-

contemporaneously to his or her decision-making did not take place in this case.

*Id.* at 92. Whitacre's failure to comply with the procedures resulted in the state court striking the confidential information from the record. "Without that confidential information," the court explained, "there is not even 'some evidence' to support the disciplinary allegations against [Smith]." *Id.* at 92–93. The state court granted Smith's application for postconviction relief, ordered that Smith's discipline records "reflect that he was not found to have violated the rules as identified in the disciplinary notice," and assessed the costs of the matter to the State of Iowa. *Id.* at 93. Because Smith "ha[d] already served the disciplinary detention," the court could not order removal of the sanction. *Id.*

Pursuant to the state court's ruling, the IDC restored Smith's 365 days of earned time and expunged the report from his disciplinary record. But the IDC did not transfer Smith back to the FDCF, a medium security facility. Instead, he remains at the ISP, and his former security classification, security points, and tier status have not been restored. Smith also does not have a job or earn wages as he had previously in FDCF.

Smith brought suit under § 1983 against the IDC prison officials, alleging that the prison officials violated his due process rights under the Fourteenth Amendment by moving him indefinitely from the FDCF, a medium security facility, to the ISP, a maximum security facility, based on a now-expunged disciplinary report. The prison officials moved for summary judgment, and the district court granted the motion. The district court determined that "no reasonable juror could conclude Smith suffered an atypical and significant deprivation in relation to the ordinary incidents of prison life"; as a result, Smith could not "show he had a liberty interest at stake that required due process protections." *Smith*, 2018 WL 10483966, at *4.

II. *Discussion*

On appeal, Smith argues that the district court erroneously granted summary judgment to the prison officials on his due process claim. He asserts that he has a liberty interest protected by the Due Process Clause of the Fourteenth Amendment in avoiding prison conditions that are restrictive or extreme in comparison to conditions at other prisons. According to Smith, he suffered an atypical and significant hardship upon his transfer to the ISP. In support, he cites (1) the indefinite duration of his confinement at the ISP, a maximum security facility; and (2) the deprivation of his employment, wages, security classification, security points, and inmate tier status upon his transfer to the ISP. In addition, he maintains that his 365-day term in disciplinary detention subjected him to conditions "substantially worse than [his] previous environment." Appellant's Br. at 12. He asserts that "[a] reasonable jury could have found on these facts that Smith's disciplinary detention and transfer to the [ISP] imposed a deprivation that was an atypical and significant hardship in relation to the ordinary incidents of prison life." *Id.* According to Smith, "the decision to commit [him] to disciplinary detention and transfer him in the first instance was based on a disciplinary allegation and report that has since been expunged because a court held that there was not even 'some evidence' that [he] violated the prison rules." *Id*.

We review de novo a district court's grant of summary judgment. *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1207 (8th Cir. 2013).

> The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake. A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word liberty, or it may arise from an expectation or interest created by state laws or policies.

*Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (cleaned up). "With regard to the latter, we focus on 'the nature of the deprivation' resulting from a state regulation, rather than 'the language of a particular regulation.'" *Wilkerson v. Goodwin*, 774 F.3d 845, 852 (5th Cir. 2014) (citing *Sandin v. Conner*, 515 U.S. 472, 481, 482–84 (1995); *Wilkinson*, 545 U.S. at 222–23).

"Once a liberty interest is established, the next question is what process is due." *Williams v. Norris*, 277 F. App'x 647, 649 (8th Cir. 2008) (per curiam) (citing *Wilkinson*, 545 U.S. at 224). "We need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest . . . ." *Wilkinson*, 545 U.S. at 221.

The Supreme Court has "held that the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." *Id.* (citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976)). An inmate "has no constitutional right to remain in a particular institution." *Askew v. Heflin*, 67 F.3d 303, 303 (8th Cir. 1995) (unpublished per curiam). This is true even if the inmate was transferred to "a higher-security institution [that] presented a more restrictive environment than [the prior institution]." *Freitas v. Ault*, 109 F.3d 1335, 1337 (8th Cir. 1997) (citing *Moorman v. Thalacker*, 83 F.3d 970, 973 (8th Cir. 1996) (transfer from minimum- to medium-security institution)). "In fact, prison administrators may ordinarily transfer a prisoner for whatever reason or for no reason at all." *Cornell v. Woods*, 69 F.3d 1383, 1387 (8th Cir. 1995) (cleaned up).[4]

But the Supreme Court "ha[s] also held . . . that a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations, subject to the important limitations set forth in *Sandin v. Conner*, 515 U.S. 472, 115

---

[4]"[T]hese precepts are limited by the prohibition against transferring a prisoner in retaliation for the inmate's exercise of a constitutional right." *Id.* at 1387.

S. Ct. 2293, 132 L. Ed. 2d 418 (1995)." *Wilkinson*, 545 U.S. at 222. "*Sandin* involved prisoners' claims to procedural due process protection before placement in segregated confinement for 30 days, imposed as discipline for disruptive behavior." *Id.* The Supreme Court held that inmates possess a state-created liberty interest in avoiding assignment to conditions of confinement that "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 223 (quoting *Sandin*, 515 U.S. at 484). "[T]he nature of [the] conditions [of confinement] 'in relation to the ordinary incidents of prison life'" is "the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement." *Id.* (quoting *Sandin*, 515 U.S. at 484). "Applying this refined inquiry, *Sandin* found no liberty interest protecting against a 30-day assignment to segregated confinement because it did not 'present a dramatic departure from the basic conditions of [the inmate's] sentence.'" *Id.* (alteration in original) (quoting *Sandin*, 515 U.S. at 485). In reaching this determination, the Supreme Court noted the following: (1) "inmates in the general population experienced 'significant amounts of "lockdown time"'"; (2) "the degree of confinement in disciplinary segregation was not excessive"; and (3) "the short duration of segregation [did not] work a major disruption in the inmate's environment." *Id.* (quoting *Sandin*, 515 U.S. at 486).

In summary, "[t]he *Sandin* standard requires [a court] to determine if [the confinement] 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Id.* (quoting *Sandin*, 515 U.S. at 484); *see also Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003). "The duration and degree of restrictions bear on whether a change in conditions imposes such a hardship." *Hamner v. Burls*, 937 F.3d 1171, 1180 (8th Cir. 2019), *as amended* (Nov. 26, 2019).

The issue of whether conditions of confinement constitute an atypical and significant hardship is a question of law for the court to determine when the facts are undisputed. *See, e.g.*, *Skinner v. Schriro*, 399 F. App'x 223, 224 (9th Cir. 2010)

(mem. op.) ("The district court properly granted summary judgment in defendants' favor because Skinner failed to raise a triable issue of fact as to whether his placement in the violence control unit constituted such an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life' so as to give rise to a protected liberty interest." (alteration in original) (quoting *Sandin*, 515 U.S. at 484)); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999); *Beverati v. Smith*, 120 F.3d 500, 503 (4th Cir. 1997) (explaining that the "atypical and significant hardship" inquiry is "necessarily . . . fact specific in that it requires a determination of the conditions the prisoner maintains give rise to a liberty interest and those incident to normal prison life" but that "the ultimate determination of whether the conditions impose such an atypical and significant hardship that a liberty interest exists is a legal determination, subject to de novo review.").[5]

---

[5]In *Portley El v. Brill*, the inmate claimed "that the district court erred in dismissing his due process claims under *Sandin* because whether prison discipline 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life' is a fact question unsuitable for resolution solely on the basis of an inmate's complaint." 288 F.3d 1063,1065 (8th Cir. 2002). "We agree[d] that atypical and significant hardship is a *question of fact* that may require a fuller record than the initial complaint." *Id.* (emphasis added). But, we nevertheless found that the inmate failed to "allege a liberty interest, did not describe [the inmate's] conditions of confinement in Minnesota punitive segregation or Colorado administrative segregation, and did not allege that those conditions were atypical and significant hardships in relation to the ordinary incidents of his prison life." *Id*. Because the inmate failed to "make a threshold showing that the deprivation of which he complains imposed an 'atypical and significant hardship,'" we held that the inmate's "due process claims were defectively pleaded." *Id.* (first quoting *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000), then citing *Howard v. Collins*, 129 F.3d 121, 1997 WL 710314 (8th Cir. 1997) (unpublished per curiam); *Hemphill v. Delo*, 124 F.3d 208, 1997 WL 581072 (8th Cir. 1997) (unpublished per curiam)).

*Portley El*'s statement that "atypical and significant hardship is a question of fact" is not contrary to our recognition that when the facts as to the conditions of confinement are *undisputed* on summary judgment, it is appropriate for the court to decide the *Sandin* issue as a matter of law.

Post-*Sandin*, "the Court of Appeals have not reached consistent conclusions for identifying the baseline from which to measure what is atypical and significant in any particular prison system." *Wilkinson*, 545 U.S. at 223 (citing cases). The Supreme Court has acknowledged "the difficulty of locating the appropriate baseline" by which to measure what constitutes an atypical and significant hardship, but it has not resolved the issue. *Id.* Instead, in *Wilkinson*, the Supreme Court held that inmates' assignment to a state supermax prison "impose[d] an atypical and significant hardship under any plausible baseline." *Id.* At the state supermax prison, the inmates were prohibited from "almost all human contact . . . , even to the point that conversation [was] not permitted from cell to cell." *Id.* at 223–24. In addition, "the light, though it may be dimmed, [was] on for 24 hours." *Id.* at 224. And, the inmates were permitted only one hour of exercise per day. *Id.* These conditions, the Court recognized, "likely would apply to most solitary confinement facilities," "[s]ave perhaps for the especially severe limitations on all human contact." *Id.* But the Court identified "two added components." *Id.* The first additional component was the duration of the placement. *Id.* "Unlike the 30-day placement in segregated confinement at issue in *Sandin*, placement at [the state supermax facility] [was] indefinite and, after an initial 30-day review, [was] reviewed just annually." *Id.* The second additional component was "that placement disqualifies an otherwise eligible inmate for parole consideration." *Id.* "[T]aken together," the Court held, these conditions "impose[d] an atypical and significant hardship within the correctional context." *Id.* Therefore, the Court concluded that the inmates had "a liberty interest in avoiding assignment to [the state supermax facility]." *Id.*

Despite the lack of an established "baseline from which to measure what is atypical and significant in any particular prison system," *id.* at 223, we have affirmatively held what does *not* constitute an atypical or significant deprivation. "We have consistently held that a demotion to segregation, even without cause, is not itself an atypical and significant hardship." *Phillips*, 320 F.3d at 847; *see also Portley El*, 288 F.3d at 1065 ("We have consistently held that administrative and disciplinary

segregation are not atypical and significant hardships under *Sandin*."). Indeed, "*Sandin* teaches that [an inmate] has no due process claim based on [a] somewhat more restrictive confinement because he has no protected liberty interest in remaining in the general prison population; his only liberty interest is in not being subjected to 'atypical' conditions of confinement." *Wycoff v. Nichols*, 94 F.3d 1187, 1190 (8th Cir. 1996).

As a result, "to assert a liberty interest," the inmate "must show some difference between his new conditions in segregation and the conditions in the general population which amounts to an atypical and significant hardship." *Phillips*, 320 F.3d at 847; *see also Moorman*, 83 F.3d at 973 (concluding that the inmate's "detention appear[ed] no more severe than that in *Sandin*" and did "not appear to have been a disruption exceeding the ordinary incidents of prison life").

For example, in *Kennedy v. Blankenship*, the inmate was "found . . . guilty of violating prison rules and sentenced . . . to thirty days in 'punitive isolation,' a stricter form of custody than the 'administrative segregation' status [the inmate] had at the time." 100 F.3d 640, 641 (8th Cir. 1996). We held that the inmate's due process rights were not violated even though the inmate "lost more privileges as a result of his punishment than did the inmate in *Sandin*." *Id.* at 642. Specifically, the inmate lost "the privilege of working and the accompanying good time credits" while in punitive isolation. *Id.* at 642 n.2. And, while in punitive isolation, the inmate "face[d] restrictions on mail and telephone privileges (privileged mail and emergency calls only), visitation privileges (the inmate's attorney only, rather than biweekly general visitation), commissary privileges, and personal possessions (legal materials, a religious text, soap, toothbrush, toothpaste, washcloth, and toilet paper only)." *Id.* Although inmates "referr[ed] to punitive isolation as 'the hole,'" we found it "abundantly clear that that description is a significant exaggeration of actual conditions." *Id.* "Considering all the circumstances, we conclude[d] that [the inmate's] transfer from administrative segregation to punitive isolation was not 'a

dramatic departure from the basic conditions' of his confinement and thus [did] not constitute 'the type of atypical, significant deprivation in which a state might conceivably create a liberty interest.'" *Id.* at 643 (quoting *Sandin*, 515 U.S. at 485–86).

Similarly, in *Freitas*, the analysis focused on "whether the conditions of [the inmate's] confinement after [the inmate's] transfer [from a minimum security facility to a medium security facility] constituted a hardship that could reasonably be characterized as atypical and significant." 109 F.3d at 1337 (internal quotation omitted). We held that Freitas's conditions of confinement did not meet that standard. We reasoned that even though the inmate was transferred to "a higher-security institution [that] presented a more restrictive environment . . . , there [was] no liberty interest in assignment to any particular prison." *Id.* We further noted that the inmate had previously been housed at the medium security facility before coming to the minimum-security facility. *Id.* at 1336. As a result, "[w]e fail[ed] to understand . . . why a return to an institution previously inhabited by an inmate whose custody rating matches that of the institution can be a departure from the ordinary incidents of prison life." *Id.* at 1338. We determined that the inmate's "ten days of administrative segregation . . . and . . . thirty days of 'on-call' status" were not "'atypical and significant' deprivations." *Id.* Finally, we held that the inmate's "loss of a higher-paying job and other privileges" and his "lost ability to earn good time (when no previously earned bonus time had been revoked and the loss evidently had no other practical effect on [the inmate's] sentence)" did not amount to "an atypical hardship." *Id.*

In the present case, Smith argues that the conditions of confinement he endured while in segregation and upon his transfer to the ISP imposed an atypical and significant hardship on him in relation to the ordinary incidents of prison life. First, he cites as an atypical and significant hardship his transfer from the FDCF, a medium security facility, back to the ISP, a maximum security facility, for an indefinite

duration. According to Smith, he "has been in the maximum security facility for nearly five years, and there is no sign that he will be moved to a less restrictive prison anytime soon." Appellant's Br. at 17. "Although [ISP] was a higher-security institution . . . , there is no liberty interest in assignment to any particular prison." *Freitas*, 109 F.3d at 1337. Moreover, Smith was returning to an institution that he previously inhabited. *See id.* at 1338 ("We fail to understand, moreover, why a return to an institution previously inhabited by an inmate whose custody rating matches that of the institution can be a departure from the ordinary incidents of prison life.").

Because the transfer to a higher security facility alone is insufficient to establish an atypical and significant hardship, we must examine "whether the conditions of [Smith's] confinement [in administrative segregation at the FDCF and] after his transfer [to the ISP] constituted a hardship that could reasonably be characterized as atypical and significant." *Id.* at 1337 (internal quotation omitted). As an initial matter, Smith notes that he was subjected to 365 days of disciplinary detention. He was first placed in administrative segregation while at the FDCF and then placed in disciplinary detention, otherwise known as "the hole," upon his arrival to the ISP. But Smith has failed to set forth facts describing his conditions of confinement while in administrative segregation and disciplinary detention. Smith's reference to disciplinary detention as "the hole" is not descriptive of what conditions he faced. *Cf. Blankenship*, 100 F.3d at 641 n.2 ("[A]lthough prisoners in Arkansas apparently refer to punitive isolation as 'the hole,' it is abundantly clear that that description is a significant exaggeration of actual conditions."). Without a description of the conditions of confinement while in segregation, we are left with our precedent "that demotion to segregation, even without cause, is not itself an atypical and significant hardship." *Phillips*, 320 F.3d at 847.

Smith also cites his loss of employment, wages, security classification, security points, and inmate tier status upon his transfer to the ISP. But none of these losses, individually or collectively, amounts to an atypical and significant hardship under our

precedent. *See, e.g.*, *Freitas*, 109 F.3d at 1338 (concluding that inmate's "loss of a higher-paying job and other privilege" did not "constitute[] an atypical hardship"); *Blankenship*, 100 F.3d at 642 n.2 (concluding that inmate's loss of "the privilege of working and the accompanying good time credits" while in punitive isolation did not constitute an atypical hardship).

Because we hold that the conditions of confinement that Smith faced during administrative segregation at the FDCF and upon his transfer to the ISP do not amount to an atypical and significant deprivation when compared to the ordinary incidents of prison life, we affirm the district court's grant of summary judgment to the prison officials on Smith's due process claim.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____