Cite as 2025 Ark. App. 200

# ARKANSAS COURT OF APPEALS

DIVISION II

No. CV-23-464

| | |
|---|---|
| MORRIS KOONTZ<br><div align="right">APPELLANT</div><br><br>V.<br><br><br>DEXTER PAYNE, DIRECTOR, ARKANSAS DIVISION OF CORRECTION; DALE REED, DEPUTY DIRECTOR, ARKANSAS DIVISION OF CORRECTION; WILLIAM STRAUGHN, DEPUTY DIRECTOR, ARKANSAS DIVISION OF CORRECTION; RANDY WATSON, WARDEN, ARKANSAS DIVISION OF CORRECTION; JEREMY ANDREWS, DEPUTY WARDEN, ARKANSAS DIVISION OF CORRECTION; GAYLON LAY, WARDEN, ARKANSAS DIVISION OF CORRECTION; JAMES DYCUS, DEPUTY WARDEN, ARKANSAS DIVISION OF CORRECTION; AND ANTHONY JACKSON, DEPUTY WARDEN, ARKANSAS DIVISION OF CORRECTION<br><div align="right">APPELLEES</div> | **Opinion Delivered** April 9, 2025<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, TWELFTH DIVISION<br>[NO. 60CV-21-5262]<br><br>HONORABLE CARA CONNORS, JUDGE<br><br>AFFIRMED |

**N. MARK KLAPPENBACH, Chief Judge**

Pursuant to the Arkansas Civil Rights Act of 1993 (ACRA), Ark. Code Ann. § 16-123-105 (Repl. 2016), Morris Koontz filed a pro se civil-rights complaint in the Pulaski

County Circuit Court against the following employees of the Arkansas Division of Correction (ADC) in their official and individual capacities: Dexter Payne, director; Dale Reed, deputy director; William Straughn, deputy director; Randy Watson, warden; Jeremy Andrews, deputy warden; Gaylon Lay, warden; James Dycus, deputy warden; and Anthony Jackson, deputy warden. In his complaint, Koontz alleged that appellees violated his constitutional rights in connection with ADC's restrictive-housing-review process and state statutory law authorizing confiscation of inmates' federal COVID-19 stimulus financial aid and requested declaratory relief along with money damages, penalties, and fees. The circuit court granted appellees' motion and dismissed Koontz's complaint. On appeal, Koontz argues that the circuit court abused its discretion in dismissing his complaint. We affirm.

I. *Standard of Review*

The standard of review for the granting of a motion to dismiss is whether the circuit court abused its discretion. *Muntaqim v. Kelley*, 2022 Ark. App. 76, at 2, 641 S.W.3d 35, 40. An abuse of discretion occurs when the court has acted improvidently, thoughtlessly, or without due consideration. *Id.* In reviewing the circuit court's decision on a motion to dismiss under Arkansas Rule of Civil Procedure 12(b)(6), we treat the facts alleged in the operative complaint as true and view them in the light most favorable to the party who filed the complaint. *Id.* In testing the sufficiency of the complaint on a motion to dismiss, all reasonable inferences must be resolved in favor of the complaint, and the pleadings are to be liberally construed. *Id.* However, under our fact-pleading requirement, a complaint must state facts, not mere conclusions, to entitle the pleader to relief. *Id.*

2

## II. *Background*

Koontz is an inmate incarcerated at the East Arkansas Regional Max Unit of the ADC. On September 10, 2021, he filed a pro se civil-rights complaint asserting constitutional violations relating to ADC's restrictive-housing-review process and state law governing the confiscation of state inmates' federal COVID-19 stimulus funds—namely, Act 1110 of 2021 (codified at Ark. Code Ann. § 12-29-120 (Supp. 2023)). Appellees sought dismissal of the complaint on several bases, including (1) sovereign immunity; (2) statutory immunity; (3) failure to state facts upon which relief can be granted under Arkansas Rule of Civil Procedure 12(b)(6); and (4) a permanent injunction entered by the United States District Court for the Eastern District of Arkansas enjoining ADC from using or disbursing inmates' federal stimulus funds in any manner other than "to pay off an inmate's court fines, fees, costs, or restitution pursuant to Act 1110" and requiring ADC to reimburse inmates any funds remaining that had not been used for these limited purposes.[1] Additionally, they submitted

---

[1]Following the passage of Act 1110 of 2021, numerous Arkansas state inmates filed lawsuits in the United States District Court for the Eastern District of Arkansas challenging the Act on various constitutional and statutory grounds. The federal court consolidated the cases and designated three as "appropriate and representative test cases[.]" *See Hayes v. Graves*, No. 4:21-CV-00347-LPR, 2022 WL 822881, (E.D. Ark. Mar. 16, 2022); *Lamar v. Hutchinson*, No. 4:21-CV-00529-LPR (E.D. Ark.); *Holloway v. Ark. Gen. Assembly*, No. 4:21-CV-00495-LPR (E.D. Ark.). The plaintiffs in those cases argued, inter alia, that enforcement of Act 1110 violates the Takings Clause, procedural due process, and substantive due process. On September 3, 2021, the federal court entered a preliminary injunction significantly limiting the circumstances in which state prison officials could take and redirect the stimulus funds sent to prisoners. On March 16, 2022, the court entered a final order and judgment, including a permanent injunction, in the test cases and ordered the administrative termination of all the other cases, finding that its final order and judgment "likely address[ed] or moot[ed] most of the other cases."

documentary proof showing that (1) on May 28, 2021, ADC deposited federal stimulus funds issued to Koontz (a total of $1,400) into an "Act 1110 Stimulus Funds Account"; (2) on August 19, 2021, ADC sent $790 of Koontz's federal stimulus funds to Hempstead County to pay off Koontz's pending fines, fees, and court costs; and (3) on March 18, 2022, ADC deposited the balance of Koontz's federal stimulus funds ($610) into Koontz's inmate account. Following a hearing, the circuit court dismissed Koontz's Act 1110 claims without prejudice. Koontz filed an amended complaint, but he did not request any specific type of relief. The circuit court granted appellees' motion to dismiss "based upon sovereign immunity as Plaintiff's Amended Complaint is unclear as to the relief being sought" and allowed Koontz three weeks to file an amended complaint.

On November 14, 2022, Koontz filed a second amended complaint—the operative complaint in this case. In the complaint, he claimed that both Act 1110 of 2021 and Act 715 of 1981, commonly known as the State Prison Inmate Care and Custody Reimbursement Act (codified at Ark. Code Ann. §§ 12-29-501 to -507, formerly Ark. Stat. Ann. § 46-1701), are unconstitutional. He asserted that Act 1110, unlike Act 715, "allows the state to take money without any process" and alleged that "Defendants took [his] stimulus check without his consent and this check is his property." He asserted that Act 715 "enhances the punishment on a person convicted of a crime . . . by allowing the state to take money from a prisoner for his care and custody but the state provides no means for a prisoner to pay for this care and custody." He also claimed that he was denied due process in connection with ADC's restrictive-housing-review process. He asserted that the conditions

4

of his confinement in restrictive housing for an "aggregate of 10 ½ years" impose an atypical and significant hardship on him, creating a liberty interest protected by due process, and he alleged that appellees denied him the process he was due by providing "sham" reviews of his restrictive-housing assignment.

From a review of the operative complaint, Koontz's civil-rights action is based on the following alleged facts. Koontz was placed in punitive isolation at the Tucker Max Unit after receiving a disciplinary sanction "for assault on staff" in June 2012. He was subsequently transferred to the Varner Supermax Unit and told that he had to complete an eighteen-month behavior-modification program before he could be released back into the general prison population. He completed the eighteen-month program in January 2014 and was assigned to administrative segregation until he was transferred to the East Arkansas Regional Max Unit in March 2016.

In December 2016 or January 2017, he was told by Deputy Director Dale Reed, Deputy Warden James Dycus, and Unit Warden Jeremy Andrews that he would be required to complete a step-down program before he could be released into the general prison population from restrictive housing. In October 2017, the step-down program at the East Arkansas Regional Max Unit "was suspended and everyone assigned placed on lockdown." Koontz was then transferred to the Ester Unit in Pine Bluff and placed in the general prison population. After a classification hearing at the Ester Unit, "Unit Warden Moses Jackson immediately had [him] transferred back" to the East Arkansas Regional Max Unit and "put back on lockdown without any disciplinary sanction."

Koontz alleged in the complaint that he has been assigned to either administrative segregation or restrictive housing for an aggregate of over ten years, and "[a]ll classification reviews have been sham proceedings because [his] status is already predetermined before he is seen." He "was told at Classification Committee hearings and via unit mail that the Unit Classification Committee had no authority to release [him]" into the general prison population; and "release could only come thru director or ADC management team." According to Koontz, he "only saw the director once a year and ADC management team never," and at his housing review hearings, "he is only told to remain and no reason given." Koontz further alleged that since the filing of the complaint, appellees "have continuously implemented" the following punishments: (1) restriction to only two showers a week and six recreation/yard calls and ten shaves/haircuts since October 1, 2021; (2) imposition of twenty-four-hour restrictions on out-of-cell time for weeks at a time since January 1, 2022; and (3) not replacing his cup, shoes, and spoon on a consistent basis.

On December 15, 2022, appellees moved to dismiss and strike Koontz's second amended complaint pursuant to Arkansas Rule of Civil Procedure 12(f). After a March 29, 2023 hearing, the circuit court granted appellees' motion and entered an order dismissing Koontz's claims as follows:

> 1. Plaintiff's claims related to Act 1110 of 2021 are **DISMISSED WITH PREJUDICE**. The constitutionality and applicability of Act 1110 have been determined by litigation in the federal courts of Arkansas. And consistent with this Court's rulings on Plaintiff's Complaint and First Amended Complaint, Plaintiff has not stated a claim for relief as to Act 1110 in his Second Amended Complaint.

6

2. Plaintiff's claims related to Act 715 of 1981 are **DISMISSED WITH PREJUDICE**. Act 715 has been upheld as constitutional by the Arkansas Supreme Court. And Plaintiff has not stated a claim for relief as to Act 715 in his Second Amended Complaint.

3. Plaintiff's claims under the Administrative Procedure Act are **DISMISSED WITH PREJUDICE**. At the hearing, Plaintiff couched some of his allegations in terms of an administrative appeal. But the Second Amended Complaint does not refer to the Administrative Procedure Act by name or description. Nor does the Second Amended Complaint identify an adjudication that Plaintiff, as an inmate in the custody of the Arkansas Division of Correction, could have appealed. Plaintiff has therefore not stated a claim for relief as to the Administrative Procedure Act in his Second Amended Complaint.

4. Plaintiff's remaining claims, which demand damages, penalties, and costs, are **DISMISSED WITH PREJUDICE**. Because defendants are state officials or employees, sovereign immunity bars such claims against Defendants in their official capacities. And the Second Amended Complaint makes generalized, conclusory allegations against Defendants in their personal capacities. This fails to state a claim for relief sufficient to overcome statutory immunity under Ark. Code Ann. § 19-10-305.

III. *Sovereign and Statutory Immunity*

Sovereign immunity for the State of Arkansas arises from an express declaration in article 5, section 20 of the Arkansas Constitution. *Muntaqim*, 2022 Ark. App. 76, at 6, 641 S.W.3d at 42. A suit against the State is barred by the sovereign-immunity doctrine if a judgment for the plaintiff will operate to control the action of the State or subject the State to liability. *Id.* Because sovereign immunity is jurisdictional immunity from suit, jurisdiction must be determined entirely from the pleadings. *Id.* at 2, 641 S.W.3d at 40. When the pleadings show that the action is one against the State, the circuit court acquires no jurisdiction. *Swanigan v. Ark. Dep't of Corr.*, 2014 Ark. 196, at 2. In determining whether

7

sovereign immunity applies, the decisive question is whether a judgment for the plaintiff will operate to control the action of the State or subject the State to liability. *Fegans v. Norris*, 351 Ark. 200, 206, 89 S.W.3d 919, 924 (2002) (per curiam). If so, the suit is one against the State and is barred by the doctrine of sovereign immunity. *Id.*

The sovereign-immunity doctrine applies to state agencies and state employees sued in their official capacities. *Muntaqim*, 2022 Ark. App. 76, at 7, 641 S.W.3d at 42. This is because a suit against a state employee in his or her official capacity is essentially a suit against that official's agency and, as such, is no different than a suit against the State itself. *Id.* at 6, 641 S.W.3d at 42. A claim of sovereign immunity may be surmounted, however, if the state agency is acting illegally, and this court has long recognized that a state agency or officer may be enjoined from an action that is ultra vires. *Id.* at 7, 641 S.W.3d at 42. But the scope of these limited exceptions to sovereign immunity does not extend to claims for monetary damages. *Id.*, 641 S.W.3d at 42; *see also Ark. Dep't of Hum. Servs. v. Harris*, 2020 Ark. 30, at 3–4, 592 S.W.3d 670, 673 ("[W]e have not recognized an exception to sovereign immunity for unconstitutional acts or acts that are ultra vires, arbitrary, capricious, or in bad faith when a plaintiff seeks monetary damages."). An exception to sovereign immunity, moreover, is not exempt from the court's fact-pleading requirement. *Harmon v. Payne*, 2020 Ark. 17, at 4, 592 S.W.3d 619, 623. The complaint must plead sufficient facts establishing an unconstitutional or unlawful act that would avoid application of sovereign immunity. *Id.*; *see also Ark. Dep't of Fin. & Admin. v. 2600 Holdings, LLC*, 2022 Ark. 140, at 7, 646 S.W.3d 99, 103 ("A lawsuit

against the State seeking declaratory relief may survive a sovereign-immunity challenge only if the complaint alleges that the State acted illegally, unconstitutionally, or ultra vires.").

With respect to individual state actors, Arkansas Code Annotated section 19-10-305(a) (Repl. 2016) provides state officials and employees with statutory immunity from civil liability and from suit for nonmalicious acts made within the course and scope of their employment. In determining whether state actors are entitled to statutory immunity, the court has traditionally been guided by the federal standard for qualified immunity. *Muntaqim*, 2022 Ark. App. 76, at 7, 641 S.W.3d at 42. Under that standard, a state official is entitled to qualified immunity unless (1) the plaintiff has alleged facts that demonstrate the deprivation of an actual constitutional right, and (2) the right was clearly established at the time of the alleged violation such that a reasonable official would have known that his actions were unlawful. *Id.* Our supreme court has said that individual state actors are entitled to statutory immunity unless they transgress "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harmon*, 2020 Ark. 17, at 5, 592 S.W.3d at 623 (citation omitted). To counter a defense of statutory immunity, the complaint also must allege sufficient facts to support a claim that the state officer or employee acted with malicious intent. *Id.*; *see also Rutledge v. Remmel*, 2022 Ark. 86, at 7, 643 S.W.3d 5, 9–10 (defining malice as "intent and disposition to do a wrongful act greatly injurious to another").

ACRA imposes liability when state officials acting under color of state law deprive persons of their rights under the Arkansas Constitution. Ark. Code Ann. § 16-123-105(a)

9

(Repl. 2016). In construing ACRA, this court may look for guidance to state and federal decisions interpreting the federal Civil Rights Act, 42 U.S.C. § 1983. *Muntaqim v. Payne*, 2021 Ark. 162, at 5, 628 S.W.3d 629, 635. To state a claim under ACRA, a prisoner must plead that the state official, through his or her own individual actions, violated the constitution. *Id.* at 10, 628 S.W.3d at 638. "A bare allegation that someone in supervisory authority has been deliberately indifferent without any specification of that person's contact in fact with the prisoner or even an explicit charge of inadequate training or supervision of subordinates is not sufficient[.]" *Id.*

Koontz's constitutional claims for monetary damages against appellees in their official capacities are claims against the State and are therefore barred by the doctrine of sovereign immunity. *See Muntaqim v. Payne*, 2024 Ark. App. 455, at 11. Accordingly, we hold that the circuit court did not abuse its discretion in dismissing those claims. Koontz also seeks declaratory relief against appellees in their official capacities, and he has asserted that appellees in their individual capacities violated his constitutional rights. Therefore, we must determine whether Koontz pleaded facts relating to his constitutional claims upon which relief can be granted, which will include the consideration of whether he pleaded facts sufficient to demonstrate that appellees acted "ultra vires." With respect to Koontz's individual-capacity claims, we must determine whether he has alleged facts that demonstrate appellees, acting with malicious intent, transgressed "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harmon*, 2020 Ark. 17, at 5, 592 S.W.3d at 623 (citation omitted).

IV. *Housing Review*

Koontz claims that he was denied due process in connection with ADC's policy and procedures relating to periodic review of his assignment to various forms of restrictive housing.[2] Prisoners have a constitutional right to receive due process during prison proceedings only if they implicate a liberty interest. *Muntaqim*, 2024 Ark. App. 455, at 14. Prison policy and procedures do not create a liberty interest to which due process can attach. *Id.* Rather, any alleged liberty interest must be an interest in the nature of the prisoner's confinement, not an interest in the procedures by which the State believes it can best determine how a prisoner should be confined. *Id.*; *see also Kennedy v. Blankenship*, 100 F.3d 640, 643 (8th Cir. 1996) (there is no federal constitutional liberty interest in having state officers follow state law or having prison officials follow prison regulations). Accordingly, to maintain an action for deprivation of a right to due process, the prisoner, as a threshold matter, "must show an atypical and substantive deprivation that was a dramatic departure from the basic conditions of his confinement." *Muntaqim*, 2024 Ark. 455, at 14 (citation omitted). To do so, the prisoner must allege facts sufficient to "show some difference between his new conditions" and the basic conditions of his confinement which amounts to

---

[2]According to Koontz's allegations, he has been transferred between multiple units with varying levels of security, including a brief placement in the general prison population at one of these units, and he has spent much time assigned to a restrictive housing step-down program, which, among other things, gradually increases participants' out-of-cell time and other privileges. Koontz submitted documents below showing that in November 2017, the Classification Committee approved his placement in Level IV of the step-down program, the highest level within the program imposing the least restrictions.

an atypical and significant hardship. *Smith v. McKinney*, 954 F.3d 1075, 1082 (8th Cir. 2020). The duration and degree of restrictions bear on whether a change in conditions imposes such a hardship. *Spann v. Lombardi*, 65 F.4th 987, 992 (8th Cir. 2023).

While Koontz asserts that the duration of his assignment to restrictive housing and restrictions on his out-of-cell time, exercise, showers, shaves/haircuts, and personal possessions impose an atypical and significant hardship sufficient to create a liberty interest protected by due process, his due-process claim is not based on a *change* in the conditions of his confinement. He does not assert any constitutional deprivation with respect to his initial placement in restrictive housing.[3] Instead, he contends that the periodic housing-assignment reviews he has received were not meaningful in that he was told by unspecified individuals that only the director could authorize his transfer to general population from restrictive housing and was not provided with any reason for the continuation of his assignment to restrictive housing. Even assuming for the sake of analysis that Koontz enjoyed a liberty interest vis-à-vis his continued assignment to restrictive housing, his complaint fails to plead

---

[3]Koontz previously sought judicial review of ADC's actions and procedures relating to his major disciplinary convictions for, among others, "rape or forced sexual assault with staff or person of another inmate" and "assault-any willful attempt or threat(s) to inflict injury upon staff," which resulted in his classification as an inmate subject to ADC's Prison Rape Elimination Act ("PREA") policy and transfer and placement in administrative segregation at the Varner Supermax Unit in June 2012, as well as a subsequent determination that he "would remain in administrative segregation based on his status as a sexual predator." *Koontz v. Hobbs*, 2014 Ark. 232, at 2–3 (per curiam).

sufficient facts to state a claim against appellees for the denial of his constitutional right to due process.

In the context of a prisoner's placement in segregated confinement, only informal, non-adversary due-process procedures are required. *Wilkinson v. Austin*, 545 U.S. 209, 229 (2005). Informal due process requires that an inmate be given notice of the reasons for his placement in segregated confinement, an opportunity to present his views to a neutral decisionmaker, and periodic review of his placement in segregated confinement. *Spann*, 65 F.4th at 992. Further, the Eighth Circuit has held that there is no clearly established constitutional right to adequate justification for continued placement in segregated confinement. *See Hamner v. Burls*, 937 F.3d 1171, 1179–80 (8th Cir. 2019) (concluding that prisoner failed to identify any "circuit precedent holding that an inadequate justification for administrative segregation or shortcomings in review of a prisoner's placement violate the Due Process Clause"). Taking Koontz's allegations as true, as we must, the procedures afforded to him with respect to periodic review of his restrictive housing were adequate under the informal-due-process standard. *See Spann*, 65 F.4th at 992–93 (periodic-review requirement satisfied by assessing prisoner's status in administrative segregation every ninety days).

Additionally, as appellees note, Koontz's complaint mentions only four defendants by name, alleging that "[i]n December 2016 January 2017, [Koontz] was told by Deputy Director Dale Reed[,] then Deputy Warden James Dycus[,] and unit Warden Jeremy Andrews that [he] would have to complete re-entry/step-down program" before he could be

13

released from restrictive housing. The complaint also alleges that in "October 2017," Koontz was transferred from the East Arkansas Regional Max Unit to the Ester Unit, placed in general population, and transferred back to restrictive housing at the East Arkansas Regional Max Unit the "same day" by Deputy Warden Anthony Jackson. The alleged statements by appellees Reed, Dycus, and Andrews that Koontz would have to complete required prison programming do not rise to the level of a constitutional violation. *See Irving v. Dormire*, 519 F.3d 441, 448 (8th Cir. 2008) (generally, even verbal threats are insufficient to violate the constitution). Nor does the mere allegation that appellee Jackson transferred Koontz back to the East Arkansas Regional Max Unit in 2017. *See Goff v. Burton*, 7 F.3d 734, 737–38 (8th Cir. 1993) (an inmate may be transferred "for whatever reason or for no reason at all," so long as retaliation for exercise of a constitutional right was not the actual motivating factor). Koontz failed to state sufficient factual allegations that any appellee was personally involved in actions that could amount to a constitutional due-process violation and therefore also failed to allege any acts that were malicious or that violated a clearly established constitutional right. Because Koontz's complaint does not allege sufficient facts to state a due-process claim and, similarly, fails to sufficiently plead an exception to sovereign immunity and to preclude statutory immunity, we hold that the circuit court's dismissal of his restrictive-housing claim was not an abuse of discretion.

V. *Federal Stimulus Funds*

Koontz argues that the taking of his federal stimulus funds "without notice, hearing, or any other process" deems Act 1110 of 2021 unconstitutional. As with his restrictive-

14

housing claim, Koontz failed to allege that any appellee was personally involved in actions with respect to enforcement of Act 1110 vis-à-vis his federal stimulus funds. *See Muntaqim*, 2021 Ark. 162, at 10, 628 S.W.3d at 638 (a bare allegation that a prison official has been deliberately indifferent without any specification of that person's contact in fact with the prisoner is insufficient to state a claim). The circuit court, therefore, properly dismissed Koontz's complaint against appellees for failure to state facts upon which relief can be granted.

Moreover, as the circuit court acknowledged, the United States District Court for the Eastern District of Arkansas has addressed and resolved the constitutional issue relating to Act 1110, concluding, inter alia, that there is no unconstitutional taking when prisoners' stimulus funds are used to pay off their existing court fines, fees, costs, or restitution. *See Hayes v. Graves*, No. 4:21-CV-347-LPR, 2022 WL 822881, at *6. In its final order, the federal court entered a permanent injunction, covering "all prisoners to whom Act 1110 applied, applies, or could apply[,]" as follows:

1. The Court orders Defendants to return any confiscated federal relief or stimulus funds currently held in the sequestered account that are not being used to pay off a prisoner's court fines, fees, costs, or restitution. Defendants have 90 days from the date of this Order to return such funds to the prisoner or former prisoner from whom those funds were confiscated.

2. Defendants may continue to collect prisoners' federal relief or stimulus funds pursuant to Act 1110 so long as the confiscated funds are deposited into the sequestered account. Otherwise, the confiscation may not occur. For any future confiscations of federal relief or stimulus funds, Defendants will have 90 days from the date of confiscation to determine whether a prisoner has existing court fines, fees, costs, or restitution. Defendants may

use the confiscated funds to pay off existing court fines, fees, costs, or restitution. However, on or before the 90th day, Defendants must return to the prisoner or former prisoner any confiscated funds that are in excess of the identified court fines, fees, costs, or restitution.

3. Defendants shall continue to maintain specific and detailed records of: (a) which prisoner's federal relief or stimulus funds have been deposited into the sequestered account; (b) how much of each prisoner's federal relief or stimulus funds have been deposited into the sequestered account; and (c) how much of each prisoner's federal relief or stimulus funds in the sequestered account have been used to pay court fines, fees, costs, or restitution.

4. When a prisoner or former prisoner has federal stimulus or relief funds in excess of his or her identified court fines, fees, costs, or restitution, and Defendants return the excess funds to the prisoner or former prisoner, Defendants must provide that prisoner or former prisoner with documentation detailing: (a) the date or dates the federal relief or stimulus funds were confiscated; (b) the amount of confiscated funds used to pay court fines, fees, costs, or restitution; (c) the amount of confiscated funds that have been returned; and (d) the date the confiscated funds were returned.

5. Defendants may not otherwise use in any manner or disburse the federal relief or stimulus funds in the sequestered account. This includes, but is in no way limited to, placing any confiscated federal relief or stimulus funds into an inmate welfare fund or the Division of Correction Inmate Care and Custody Fund Account.

*Id.* at *12–13.

The record in this case shows that ADC correctly applied Act 1110, in compliance with the federal court's permanent injunction, to Koontz's federal stimulus funds. Accordingly, we hold that the circuit court's dismissal of Koontz's Act 1110 claim was not an abuse of discretion.

VI. *The State Prison Inmate Care and Custody Reimbursement Act*

Koontz argues that Act 715 of 1981, commonly known as the State Prison Inmate Care and Custody Reimbursement Act (codified at Ark. Code Ann. §§ 12-29-501 to -507 (Repl. 2016 & Supp. 2023), formerly Ark. Stat. Ann. § 46-1701), allows the State to take funds that inmates receive from gifts and inheritances to pay for their housing, but the State does not pay inmates for the work they perform in the State's prisons. The court properly dismissed Koontz's claim because his complaint states purely conclusory allegations. Koontz did not allege that any appellee was personally involved in actions with respect to Act 715. Nor did he allege that the Act was, or even might be, applied to him. His conclusory allegations are insufficient to state a claim upon which relief can be granted.

Additionally, as the circuit court noted in its order, our supreme court has consistently upheld the constitutionality of Act 715. *See MacKool v. State*, 2012 Ark. 287, at 6, 423 S.W.3d 28, 32 (upholding Act 715 on multiple grounds, including equal protection); *see also Burns v. State*, 303 Ark. 64, 66–70, 793 S.W.2d 779, 780–82 (1990) (holding that Act 715 does not violate petitioner's "due process or equal protection rights," is not "an ex post facto law, as it is not focused on the crimes committed by [the petitioner], nor is it additional punishment," and does not constitute a bill of attainder). Accordingly, we hold that the circuit court's dismissal was not an abuse of discretion.

Affirmed.

THYER and BROWN, JJ., agree.

*Morris Koontz*, pro se appellant.

*Tim Griffin*, Att'y Gen., by: *Noah Watson*, Sr. Ass't Att'y Gen., for appellee.